**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kevin Eugene WRIGHT, Defendant–
Appellant.**

**No. 93–5103.**

United States Court of Appeals,
Sixth Circuit.

Argued and Submitted Jan. 15, 1994.

Decided Feb. 14, 1994.

---

Van S. Vincent, Robert Anderson, Asst. U.S. Attys., Ernest W. Williams, Office of U.S. Atty., Nashville, TN, Michael E. O'Neill, U.S. Dept. of Justice, Washington, DC (argued and briefed), for U.S.

N. Reese Bagwell, Bagwell, Bagwell, Parker & Riggins, Clarksville, TN (briefed), for Kevin Wright.

Before: KENNEDY, MILBURN, and GUY, Circuit Judges.

MILBURN, Circuit Judge.

Defendant Kevin Wright appeals his convictions for one count of conspiring to distribute cocaine base in violation of 21 U.S.C. § 846, two counts of possessing cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a), and two counts of carrying or using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). On appeal, the issues are (1) whether the district court properly denied defendant's motion to suppress, (2) whether the evidence at trial was sufficient to sustain defendant's convictions, and (3) whether the district court properly admitted testimony

concerning defendant's prior bad acts. For the reasons that follow, we affirm.

## I.

On August 9, 1991, as part of a narcotics investigation, police officers in Springfield, Ohio, arrested Aaron Bray, Roscoe Kidd, Jr., and David McWhorter for possession of crack cocaine. At the time of his arrest, Bray was on parole for an earlier drug-related conviction. After spending one night in jail, Bray requested to speak with a police officer. In response to this request, Officer Barry Eggers, a member of the Springfield Narcotics Unit, met with Bray on August 10 and advised him of his *Miranda* rights. Bray then signed a waiver of those rights and voluntarily spoke with Officer Eggers.

Bray stated that he did not want to go back to prison and that he was willing to provide information to the police in exchange for leniency. Eggers told Bray that there was nothing he could do about the parole violation charge but that he could look into the Ohio drug charges. Bray then gave Eggers a list of drug dealers in the Springfield area. Included in this list was defendant Kevin Wright, also known under the alias "Charlie Brown," who Bray indicated was capable of selling the most drugs of anyone he had named. Bray also informed Officer Eggers that he, Kidd, McWhorter, and defendant had plans to go to Clarksville, Tennessee, in late August for the purpose of selling drugs. Although Bray had been arrested, he anticipated that the Clarksville trip would commence as planned without him.

Bray described the plans for this trip in detail, stating that the trip would be made in a rental car, probably rented from Thrifty Car Rentals in Vandalia, Ohio, near the Dayton airport, and that nine ounces of crack cocaine would be taken. Bray stated that the cocaine would be kept in a potato chip bag, to throw off any drug-sniffing police dogs, and that a TEC 9 (a 9 mm. semi-automatic weapon) and another 9 mm. pistol would be taken. These weapons would be stored in a pink gym bag, and ammunition would be stored in the glove compartment.

Bray further stated that upon arriving in Clarksville, they would stay at the Motel 6.

On August 15, Officer Eggers returned to the jail to speak with Bray and informed him that the state prosecutor did not believe Bray's story. To convince the officer that his information about the forthcoming trip was true, Bray provided details of a previous drug-selling trip to Clarksville in late July. On that trip they had used the same mode of operation: Bray, Kidd, McWhorter, and defendant had rented a Chrysler from Thrifty Car Rentals, initially stayed at the Motel 6, but then moved to a second motel in order to avoid detection, sold six ounces of crack cocaine for $15,000, and carried firearms in a pink gym bag. While in Clarksville, they distributed the drugs throughout the Lincoln Homes housing project from an apartment rented by a woman named "Maria."

After meeting with Bray, Officer Eggers called Officer John Atkins of the Clarksville Police Department and informed him of the upcoming trip in August and of the previous trip in July. Officer Eggers also faxed pictures of McWhorter, Kidd, Bray, and defendant Kevin Wright to Officer Atkins. Atkins and other members of the Clarksville Police Department then verified the July trip by checking the registration logs at the Motel 6 and the Midtowner Motel. Those records showed that on July 29, defendant Kevin Wright had checked into the Motel 6, listing two adults on the sign-in card and giving an address in Springfield, Ohio. A trace of the car defendant listed revealed that the automobile was a Dodge rented from Thrifty Car Rentals in Vandalia, Ohio. Also on July 29, there was a registration for two adults under the name "Bill Benson." The car listed on that registration was traced to David McWhorter. On July 30, defendant Kevin Wright checked into the Midtowner Motel, listing the same address and car as he had at the Motel 6.

Police records also indicated that on July 31, 1991, officers of the Clarksville, Tennessee, police department obtained a search warrant for apartment 13C in the Lincoln Homes housing project located in Clarksville, Tennessee. The warrant was based on a confidential informant's purchase of crack co-

caine from that apartment. Upon executing the search warrant, the officers found drug residue and drug paraphernalia, including an assortment of pipes, roach clips, baking soda, razor blades, and straws. The officers arrested the four occupants of the apartment. Three of these individuals gave statements, claiming that four out-of-state persons had been in the apartment selling crack cocaine but had left just prior to the execution of the search warrant. The men had left following a dispute with a dissatisfied drug customer, which ended in a shoot-out.

After verifying the July trip, the Clarksville police began informal surveillance of the parking lots of the two motels, looking for rental cars with Ohio plates. On Saturday, August 23, an officer located a Dodge Dynasty with Ohio plates in the Motel 6 parking lot. A license plate check revealed that the car had been rented from Thrifty Car Rentals in Vandalia, Ohio. The officer noticed that the side window of the car had been smashed with a rock. Officer Atkins then arrived on the scene and checked the motel registration log. Defendant Kevin Wright had checked into room 221 the night before, listing the same Springfield, Ohio, home address that he had listed in July. Defendant's brother, Samson Wright, had checked into room 223, listing "W221," presumably indicating he was with room 221.

As the police conducted surveillance, they observed one person leave the motel and walk toward the Lincoln Homes housing project. Another officer confirmed that this person entered an apartment there. Defendant and Samson Wright then discovered the broken car window and called the Clarksville police. When police arrived, two males, one who identified himself as Samson Wright, reported the damage. A short time later, the police observed two males leave room 221 carrying several bags, including a pink gym bag. One male from room 223 then joined them. The three individuals, later determined to be defendant Kevin Wright, Samson Wright, and Dwight Gober, got into the rented car and ran several errands, including going to a car wash and vacuuming the glass out of the car. Ultimately, the officers followed the car into the parking lot of the Midtowner Motel, across the street from the Motel 6, where defendant, who was driving the vehicle, pulled over and parked. Defendant exited the car and walked toward the motel office. The trunk latch had been released from inside the car, and Dwight Gober, the front seat passenger, exited the car and began walking toward the rear of the car. Samson Wright remained in the back seat of the car. Clarksville police officers, with weapons drawn, then surrounded the car, removed defendant from the office, and forcibly placed all three men on the ground. The police officers handcuffed defendant's hands behind his back.

Officer Atkins testified that as the officers moved to secure the area, he noticed that defendant was "moving his handcuffs around to the side[,] attempting to get into his shorts or underwear." I Tr. 62 (John Atkins). Atkins testified that, believing defendant was reaching for a gun, police officers subdued defendant, patted him down, and removed a plastic bag containing a large rock of crack cocaine from his crotch area. At this time, the three men were informed they were under arrest for trafficking in cocaine.

The officers then searched the car. Inside the trunk, police found a pink gym bag that contained a 9 mm. semi-automatic pistol, approximately $600 in cash, and nine bags filled with crack cocaine. From another gym bag, police recovered a TEC 9 pistol. A potato chip bag also was found, although it is unclear whether the drugs were found inside the potato chip bag or elsewhere in the trunk.

On March 4, 1992, a grand jury indicted defendant for conspiring to distribute cocaine base between July 25 and August 23, 1991, in violation of 21 U.S.C. § 846 (count one); possessing cocaine base with intent to distribute from July 27 to July 31, 1991, in violation of 21 U.S.C. § 841(a) (count two); carrying or using a firearm during and in relation to a drug trafficking crime from July 27 to July 31, 1991, in violation of 18 U.S.C. § 924(c) (count three); possessing cocaine base with intent to distribute on August 23, 1991, in violation of 21 U.S.C. § 841(a) (count four); and carrying or using a firearm during and in relation to a drug trafficking crime on

August 23, 1991, in violation of 18 U.S.C. § 924(c) (count five).

Prior to trial, defendant joined motions filed by his co-defendants alleging, among other things, that the district court was required to apply Tennessee law in determining the legality of the search and seizure and that the warrantless arrest of defendant and subsequent search of the rental vehicle violated the Fourth Amendment. After a hearing, the district court denied the suppression motion, holding that state search and seizure doctrines are inapplicable in federal court. The court then determined that, based on the information obtained from Bray, the police "had probable cause to believe that cocaine would be found in the defendants' automobile." Mem. Op. at 29. The court thus found that "the warrantless search of the car and subsequent seizure of weapons and cocaine did not offend the Fourth Amendment." *Id.* The court also concluded that the officers had probable cause to make a warrantless arrest of defendant in a public place and refused to suppress the evidence taken from defendant's person and from the rental car.

Also before trial, the government filed a notice of intent to introduce evidence of other crimes, wrongs, or acts pursuant to Federal Rules of Evidence 404(b) and 403. Specifically, the government argued that the evidence it sought to introduce would establish that defendant and others were present in Clarksville, Tennessee, in June 1991 for purposes of distributing crack cocaine. At a subsequent hearing, defendant objected to the admission of the June 1991 conduct, arguing that the evidence's probative value was substantially outweighed by unfair prejudice

to him. The district court ruled in favor of the government stating, "to the extent that this proof about the uncharged conduct that's offered for purposes of showing absence of mistake or accident, intent, opportunity, fits into that recognizable scenario, it's relevant, it's for a permissible purpose and its probative value outweighs any unfair prejudice in the court's judgment and I'll permit it." Tr.—Voir Dire 138.

A jury convicted defendant on all five counts alleged in the indictment.[1] The district court sentenced defendant to 535 months of imprisonment and five years of supervised release. This timely appeal followed.

## II.

### A.

#### (1)

Defendant argues that the evidence obtained from the search of his person and rental car on August 23, 1991, should have been suppressed because under Tennessee law, which imposes a stricter standard for warrantless arrests, searches, and seizures than corresponding federal law,[2] the police officers did not have probable cause for the arrest or the search. Thus, we must decide whether a federal court must look to state law to assess the validity of an arrest, search, and seizure for purposes of determining the admissibility of the seized evidence in a federal criminal trial. We review this question of law de novo. *United States v. Allen,* 954 F.2d 1160, 1166 (6th Cir.1992).

---

1. Co-defendant Samson Wright was acquitted of similar charges. Co-defendants Bray, Gober, Kidd, and McWhorter entered conditional guilty pleas before trial, each reserving the right to appeal the district court's denial of the motion to suppress. This court recently affirmed each of the co-defendant's convictions. *See United States v. Bray,* 9 F.3d 110 (6th Cir.1993) (unpublished); *United States v. McWhorter,* 9 F.3d 110 (6th Cir. 1993) (unpublished).

2. Where probable cause is based on information from an informant, the Tennessee Constitution requires a stronger showing than the Fourth Amendment. *State v. Jacumin,* 778 S.W.2d 430,

436 (Tenn.1989) (probable cause for issuing warrant); *State v. Coleman,* 791 S.W.2d 504, 505 (Tenn.Crim.App.1989) (probable cause for warrantless stop of vehicle). The Tennessee Supreme Court in *Jacumin* rejected the totality-of-the-circumstances test for assessing the adequacy of information provided by an informant, which the United States Supreme Court adopted in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and has adopted the two-pronged test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the more stringent test that *Gates* abandoned.

■ Evidence obtained by a search and seizure that violates the Fourth Amendment[3] is inadmissible in a criminal trial. *E.g., Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This exclusionary rule emanates from the Fourth Amendment, not state law, and is a judicial response to a "direct violation of the constitutional rights of the defendant." *Weeks,* 232 U.S. at 398, 34 S.Ct. at 346. "Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). Therefore, in federal court, this rule only requires the court to exclude evidence seized in violation of the Federal Constitution. A state may impose a rule for searches and seizures that is more restrictive than the Fourth Amendment; that is, the state may exclude evidence in state trials that would not be excluded by application of the Fourth Amendment alone. However, the state rule does not have to be applied in federal court. *United States v. Allen,* 954 F.2d 1160, 1168 (6th Cir.1992). The fact that Tennessee law "may now require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime." *United States v. Loggins,* 777 F.2d 336, 338 (6th Cir.1985).

Defendant relies on *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), and *United States v. Bradley,* 922 F.2d 1290 (6th Cir.1991), *overruled on other grounds by United States v. McGlocklin,* 8 F.3d 1037, 1047 (6th Cir.1993) (en banc), for the proposition that state law determines the validity of the arrest for purposes of determining whether evidence seized incident to

the arrest is admissible in a federal criminal trial. However, the continuing validity of *Di Re* is doubtful, and both *Di Re* and *Bradley* are distinguishable from the present case.

In *Di Re,* a federal agent and a state police officer made warrantless arrests of three men after receiving a tip from one of the men that he was going to purchase counterfeit gasoline ration coupons. During a search conducted at the police station, the police officer found 100 counterfeit gasoline ration coupons on Di Re's person. The government argued that the search of Di Re was justified as incident to a lawful arrest and that "the validity of an arrest without a warrant for a federal crime is a matter of federal law to be determined by a uniform rule applicable in all federal courts." *Di Re,* 332 U.S. at 589, 68 S.Ct. at 226. The Supreme Court disagreed, explaining that "in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity." *Id.*

Despite *Di Re's* apparent support for defendant's position, defendant's reliance on *Di Re* is misplaced for three reasons. First, a close examination of the *Di Re* opinion shows that the Court did not read the Fourth Amendment as requiring federal courts to exclude evidence seized incident to an arrest that lacked probable cause under a state standard. Rather, the *Di Re* rule was based on a statute, not the Constitution. The Supreme Court explained that "[b]y one of the earliest acts of Congress, the principle of which is still retained, the arrest by judicial process for a federal offense must be 'agreeabl[e]' to the usual mode of process against offenders in such State.'" *Id.,* 332 U.S. at 589, 68 S.Ct. at 226 (quoting The Act of September 24, 1789 (Ch. 20, § 33, 1 Stat. 91)).[4] The Court noted that "[t]his provision

---

**3.** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

**4.** "[F]or any crime or offence against the United States, the offender may, by any justice or judge

of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence." The Act of September 24, 1789, reprinted in *United States v. Di Re,* 332 U.S. 581, 589 n. 8, 68 S.Ct. 222, 226 n. 8, 92 L.Ed. 210 (1948).

ha[d] remained substantially similar," *id.* at 589 n. 8, 68 S.Ct. at 226 n. 8 (citing 18 U.S.C. § 591 (1940 ed.)),[5] and it was on this statutory basis that the Court concluded that state law would provide the "standard by which to test arrests without warrant, except in those cases where Congress has enacted a federal rule." *Id.* at 589–90, 68 S.Ct. at 226. Had the *Di Re* Court meant to suggest that the Constitution required compliance with state arrest law in order to admit evidence seized incident to that arrest, it would have been unconstitutional for Congress to waive compliance with state requirements, as the Court explicitly suggested Congress could do.

The Fifth Circuit has recognized the non-constitutional nature of the Supreme Court's comments in *Di Re* regarding state law. *United States v. Walker,* 960 F.2d 409, 416 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992). In rejecting a defendant's argument that Texas law should be used in determining the validity of defendant's arrest for purposes of suppression proceedings, the court suggested that " '*Di Re* is simply an instance of the Court utilizing its supervisory power to exclude from a federal prosecution evidence obtained pursuant to an illegal but constitutional federal arrest' by a local police officer," *id.* (quoting 1 Wayne R. LaFave, *Search and Seizure* § 1.5(b), at 107 (2d ed. 1987)), and explained that "the Court is no longer interested in using its supervisory power to exclude evidence obtained unlawfully but under circumstances not violative of the Fourth Amendment," *id.* (citing *United States v. Payner,* 447 U.S. 727, 733, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980)).

The second reason defendant's reliance on *Di Re* is misplaced is that the statutory provision that the *Di Re* Court relied on has been amended and no longer requires that an arrest be agreeable to the usual state process. *See* 18 U.S.C. § 3041.[6] Because the *Di Re* rule was based on a statute, not the Constitution, and that statute no longer retains the principle relied on by the *Di Re* Court, the Court's statements about using state law to determine the validity of the arrest are no longer applicable.

Third, any suggestion in *Di Re* that a federal court must use the state law of arrest to determine the applicability of the exclusionary rule has not survived subsequent decisions of the Supreme Court. In *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the Supreme Court considered the validity of the "silver platter doctrine," which allowed evidence that had been illegally seized by state authorities in violation of the Fourth Amendment nevertheless to be admitted in federal criminal trials. In rejecting this doctrine, the Supreme Court concluded that "[i]n determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out." *Id.* at 223–24, 80 S.Ct. at 1447. The Supreme Court seemingly rejected the proposition that state law controlled the admissibility of evidence in a federal criminal trial, holding that "[t]he test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.*

The Supreme Court recently reaffirmed this position in *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). The Court rejected the defendant's

---

**5.** 18 U.S.C. § 591 (1940 ed.) provided in relevant part that "[f]or any crime or offense against the United States, the offender may, ... agreeably to the usual mode of process against offenders in such State, ... be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offense."

**6.** 18 U.S.C. § 3041, which is based on 18 U.S.C. § 591 (1940 ed.), provides in relevant part that "[f]or any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate, or by any chancellor, judge of a supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested and imprisoned, or released as provided in chapter 207 of this title, as the case may be, for trial before such court of the United States as by law has cognizance of the offense."

argument "that his expectation of privacy in his garbage should be deemed reasonable as a matter of federal constitutional law because the warrantless search and seizure of his garbage was impermissible as a matter of California law." *Id.* at 43, 108 S.Ct. at 1630. Recognizing that "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution," the Court emphasized that it "ha[d] never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs." *Id.*

Although *Elkins* and *Greenwood* dealt exclusively with search and seizure law, it would be incongruous to use state law to determine whether the exclusionary rule should apply to a search incident to arrest, but to use federal law to determine whether the exclusionary rule should apply to all other searches. In fact, we have held that for the purpose of determining whether evidence should be suppressed in federal court, "the question whether [the defendant's] arrest was legal ... is controlled by federal standards." *United States v. Porter,* 701 F.2d 1158, 1165 (6th Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). The reasoning of *Di Re* no longer applies, and therefore defendant's reliance on it is misplaced. *See United States v. Walker,* 960 F.2d 409, 416 (5th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362

(1992); *United States v. Miller,* 452 F.2d 731, 733 (10th Cir.1971), *cert. denied,* 407 U.S. 926, 92 S.Ct. 2466, 32 L.Ed.2d 813 (1972). *But see United States v. Mota,* 982 F.2d 1384 (9th Cir.1993).[7]

The other case upon which defendant relies, *United States v. Bradley,* 922 F.2d 1290 (6th Cir.1991), *overruled on other grounds by United States v. McGlocklin,* 8 F.3d 1037, 1047 (6th Cir.1993) (en banc), is also inapplicable to the present case. In *Bradley,* we held that evidence obtained during a consensual search of the defendant's home following his warrantless arrest should have been suppressed, because the warrantless arrest was invalid. We stated that "the validity of a warrantless arrest is determined by reference to State law." *Id.* at 1293 (citing *Johnson v. United States,* 333 U.S. 10, 15 n. 5, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948)). However, we analyzed the arrest under both the Tennessee rule and the federal rule for warrantless arrests in the home. Under either rule, the arrest was invalid because there were no exigent circumstances to justify the failure to obtain a warrant. *Id.* at 1295.

Unlike the present case, *Bradley* involved the warrantless arrest of an individual in his home. *Johnson,* the case upon which *Bradley* relied, also involved a warrantless arrest in one's home. The Supreme Court has analyzed warrantless arrests in one's home more stringently than warrantless arrests in a public place because of the different privacy

---

**7.** *Mota* held that "in evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest." *United States v. Mota,* 982 F.2d 1384, 1388 (9th Cir.1993). *Mota* relied in part on *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). However, *Welsh* is inapposite because it did not address the issue of whether compliance with state arrest law is required by the Fourth Amendment. *Welsh* simply stands for the narrow proposition that a state's classification of an offense as a mere civil violation is one fact to be considered in determining whether, under the totality of the circumstances, "exigent circumstances" existed that would justify an officer's warrantless entry into a home. *Id.* at 753–54, 104 S.Ct. at 2099–2100.

*Mota* also relied on the Supreme Court's comment in *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979), that

"[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." However, after making this comment, the *DeFillippo* Court immediately went on to note that the defendant did "not contend ... that the arrest was not authorized by Michigan law." *Id.*

In *Ker v. California,* 374 U.S. 23, 37, 83 S.Ct. 1623, 1631, 10 L.Ed.2d 726 (1963), the case cited by the *DeFillippo* court, Justice Clark, who announced the opinion of the Court, stated that the "Court, in cases under the Fourth Amendment, has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution." However, this part of Justice Clark's opinion was not joined by a majority of the Court. Furthermore, *Ker* and *DeFillippo* involved the propriety of an arrest for purposes of state prosecutions.

interests involved. *Compare Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980) (requiring exigent circumstances to sustain warrantless arrests from home) *with United States v. Watson*, 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976) (observing that in warrantless arrest in public place, "[t]he necessary inquiry ... [is] not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest"). Therefore, the facts of *Bradley* are distinguishable from the present case.

Furthermore, *Bradley* recognized that in that case the state standard for warrantless arrests in one's home paralleled the federal standard. *Bradley*, 922 F.2d at 1295. Therefore, it was irrelevant which rule applied. In this case, on the other hand, Tennessee law applies a probable cause standard that is more strict than the federal standard. *See supra* note 2. In this respect, the present case more closely resembles *United States v. Allen*, 954 F.2d 1160 (6th Cir.1992), which we decided a year after *Bradley*. In *Allen*, we rejected the defendant's argument that the federal court should apply the more stringent Tennessee exclusionary rule because state law does not control the federal court's decision to admit evidence seized by state law enforcement officers. *Id.* at 1166–68.[8]

■ Therefore, we hold that the appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment. The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended. This is so because the exclusionary rule is only concerned with deterring Constitutional violations. Furthermore, this rule promotes uniformity in federal prosecutions. Indeed, it would be strange for the results of federal prosecutions to depend on the fortuity of the

defendant's being arrested in one state or another.

### (2)

■ Next, we must decide, under the federal standard, whether the district court erred in suppressing this evidence. In reviewing the district court's decision to suppress the evidence, we must accept the district court's findings of fact unless they are clearly erroneous, but we review de novo the district court's conclusion as to probable cause. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir.1993).

■ The district court correctly denied the defendant's motion to suppress the evidence seized from the rental car. If a vehicle is capable of use on the public roads, then a warrantless search of the vehicle does not violate the Fourth Amendment as long as the officers have "probable cause to believe that the vehicle contains evidence." *United States v. Duncan*, 918 F.2d 647, 653 (6th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). This is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances." *Id.* at 230, 103 S.Ct. at 2328.

■ There was probable cause for the warrantless search of the rental car. Even though Bray had never provided information to the police previously, the information he furnished on the occasion giving rise to the arrests in Clarksville, Tennessee, provided ample probable cause to search the rental car because a substantial amount of his information was independently confirmed by the Clarksville police. The information concern-

---

8. *Allen* demonstrates that defendant's emphasis on the fact that the entire investigation was handled by state authorities is misplaced. In *Allen*, the defendant similarly argued that state law should be applied because of the exclusive state investigation. *Allen*, 954 F.2d at 1166. However, that fact made no difference to our analysis. *Id.* at 1167.

ing the July trip to Clarksville, in which Bray had himself participated, was verified in almost every detail. The Clarksville police confirmed that defendant had rented a car from Thrifty Car Rentals in Vandalia, Ohio; defendant had checked in at the Motel 6 and then moved to the Midtowner Motel; David McWhorter had accompanied defendant on this trip; four out-of-state individuals had sold crack cocaine in the Lincoln Homes housing project on July 31, and these individuals were carrying firearms.

Furthermore, surveillance by the Clarksville police on August 23 indicated that, as predicted by Bray, defendant was following the same method of operation used in July. Defendant checked in at the Motel 6, listing the same address he had used in July. He and his co-conspirators carried a pink gym bag which, according to Bray, contained weapons and cocaine. One of the men was seen going into an apartment in the Lincoln Homes housing project, and, at the time of the arrest, they were presumably about to check into the Midtowner Motel.

Defendant argues that the Clarksville police only observed innocent activities, nothing illegal. However, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates,* 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. Often, innocent behavior will form the grounds for probable cause. *Id.*

Considering the totality of the circumstances; namely, Bray's information, the confirmation of the July trip, and the observation of the activity on August 23, we conclude that the police had reasonable grounds to believe that the rental car contained cocaine and firearms. Therefore, the search of the rental car was supported by probable cause. *See Gates,* 462 U.S. at 245, 103 S.Ct. at 2335. "If probable cause justifies a search of a vehicle which has been lawfully stopped, then that probable cause extends to justify the search of every part of the vehicle and all containers found therein in which contraband

could be hidden." *United States v. Crotinger,* 928 F.2d 203, 205 (6th Cir.1991), *overruled on other grounds by U.S. v. Ferguson,* 8 F.3d 385 (6th Cir.1993) (en banc). Thus, the district court correctly denied defendant's motion to suppress the evidence seized from the rental car.

■ The district court also correctly denied defendant's motion to suppress the evidence seized from defendant's person because this evidence was obtained from a search of defendant incident to an arrest justified by probable cause.[9] "[T]he Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest." *United States v. Watson,* 423 U.S. 411, 427, 96 S.Ct. 820, 829, 46 L.Ed.2d 598 (1976) (Powell, J., concurring) (quoted in part in *United States v. Duncan,* 918 F.2d 647, 653 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991)).

In this case, the police officers had probable cause to make a warrantless arrest of defendant. The same circumstances that provided probable cause to search the rental car provided probable cause to believe defendant was committing a drug trafficking offense. Consequently, the warrantless arrest of defendant did not violate the Fourth Amendment.

After defendant was arrested, the officers had the authority to search him incident to that arrest. *E.g., United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973). The search of defendant that resulted in the seizure of the rock of crack cocaine, therefore, did not violate the Fourth Amendment. Accordingly, the district court properly denied defendant's motion to suppress evidence.

**B.**

Defendant also attacks his convictions under counts one, two and three. Count one

---

**9.** The district court rejected the government's argument that the apprehension of defendant was a legal detention under *Terry v. Ohio,.* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),

because the police forcibly placed defendant on the ground and handcuffed him. The government has not raised this argument on appeal.

charged that between approximately July 25, 1991, and August 23, 1991, defendant and others conspired to distribute cocaine base. Count two charged that from approximately July 27, 1991, to July 31, 1991, defendant and others unlawfully distributed or possessed with intent to distribute cocaine base. Count three charged that from approximately July 27, 1991, to July 31, 1991, defendant and others unlawfully used or carried a firearm during the commission of a drug trafficking crime. Because the government did not recover the cocaine base which formed the basis of the conduct committed in July 1991, at trial it was neither able to enter into evidence the cocaine base itself nor enter into evidence a scientific analysis of the cocaine base. However, the government did present circumstantial evidence which established that the cocaine base forming the basis of the July 1991 conduct was crack cocaine. On appeal, defendant argues that the evidence submitted by the government was insufficient to establish that the subject matter of counts one, two, and three was crack cocaine.

■ "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.'" *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.) (quoting *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). "[T]he standard of review for claims of insufficient evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Evans,* 883 F.2d 496, 501 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The identity of a drug may be ascertained by circumstantial evidence, *United States v. Schrock,* 855 F.2d 327, 334 (6th Cir.1988), and such evidence "need not remove every reasonable hypotheses except that of guilt." *Vannerson,* 786 F.2d at 225 (citing *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984) ("In short, we hold once and for all that our court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and that this rule

applies whether the evidence is direct or wholly circumstantial.")). Such circumstantial evidence may include

> evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence. . . .

*United States v. Scott,* 725 F.2d 43, 45–46 (4th Cir.1984) (quoting *United States v. Dolan,* 544 F.2d 1219, 1221 (4th Cir.1976)).

■ Based upon our review of the record, we conclude that there was sufficient evidence to support defendant's convictions under counts one, two and three. The government presented several witnesses who testified that the substance involved in the three counts was crack cocaine. For example, Aaron Bray stated that in July 1991 he traveled with defendant and others to Clarksville, Tennessee, possessing crack cocaine and that he and the others intended to distribute the drugs. Bray indicated that the crack cocaine was carried in a potato chip bag in order to disguise the scent of the drug and that he and others carried firearms during the transportation of the crack cocaine. Throughout his testimony, Bray referred to the drugs as crack cocaine. After being asked by the district court how he knew he possessed cocaine, Bray responded, "Well, when we got there, I seen it, and I was selling it before we got there. I was selling it in Ohio before we got—made the trip to Clarksville. I had some left over from the previous ounce that [an alleged co-conspirator] had gave me." Bray further testified that he observed defendant "cut" the crack cocaine in one ounce packets which were intended for sale. According to Bray, approximately six ounces of crack cocaine was sold in July 1991 in the total amount of $16,000. A second govern-

ment witness, Connie Marie Daniels, testified that during July 1991, defendant and others used her apartment in Clarksville, Tennessee, to sell crack cocaine. She testified that she knew it was crack cocaine based upon her personal experience and "[b]ecause [she] had got some [herself]." A third government witness, Anita Watkins, testified in July 1991 she saw defendant and others "cutting ... up" crack cocaine in Daniels' house. Though Daniels was not specifically asked how she knew what she observed was crack cocaine, Daniels admitted on direct examination that she had used that drug. Finally, a fourth government witness, Michael Fields, testified that in July 1991 he sold crack cocaine for defendant in "dimes, forties, fifties, hundred dollar pieces." Fields also testified that he observed defendant cutting up crack cocaine during that time in Daniels' house. Given the fact that these witnesses testified that the evidence at issue was used in the same manner as an illicit drug, that a high price was paid for the substance, and that the transactions of the drug were conducted in a devious manner, among other things, we conclude that there was sufficient evidence for the jury to determine that the substance in question was crack cocaine.

Despite the testimony of these witnesses, defendant in essence sets forth two arguments to support his view that the evidence is insufficient. First, defendant argues that the testimony of Daniels and Watkins is unreliable. With respect to Daniels, defendant notes that her testimony was unclear as to whether the substance involved was crack cocaine and that Daniels "failed to so much as even mention whether she, in fact, [knew] this substance to be cocaine base or how she [knew] the substance to be cocaine base, and the prosecution elicited no further testimony from [her] on direct examination regarding whether or not this substance [was], in fact, Cocaine base." Appellant's Brief 42. With respect to Watkins, defendant argues that other than her statements that she had contact with certain people in July 1991 who, in her view, may have been engaged in illegal activity, "[s]he related no additional facts other than her limited visual 'observation' of the substance and her revelation that [the substance] 'appeared' to be crack cocaine."

Appellant's Brief 42–43. Defendant's argument, however, merely goes to the weight a finder of fact may accord to Daniels' and Watkins' testimony and not to its admissibility. In cases in which we assess the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury. *United States v. Evans,* 883 F.2d 496, 501 (6th Cir.1989). We cannot say, based on our review of the record, that any rational trier of fact would have found Watkins' and Daniels' testimony unreliable.

In addition to attacking the veracity of Daniels and Watkins, defendant also argues that this case is distinguishable from *United States v. Schrock,* 855 F.2d 327 (6th Cir. 1988). In that case, the defendant was charged with, among other things, conspiracy to possess with intent to distribute and to distribute methamphetamine. As part of its case-in-chief, the government presented the testimony of a lay witness, who, like in this case, testified as to the substance of the alleged drug involved. On appeal of his conviction, the defendant argued that the probative value of the lay witness' testimony was substantially outweighed by unfair prejudice to him. According to the defendant, because the government failed to identify scientifically the transacted substance, a possibility existed that the nature of the substances involved might not have been methamphetamine. We rejected that argument, stating:

Illegal drugs will often be unavailable for scientific analysis because their nature is to be consumed. As a practical matter, therefore, the evidentiary rule urged by [defendant] would insulate from prosecution a large class of unlawful acts involving illicit drugs when the government happens upon the scene too late to seize a sample of the substance. To our knowledge, no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense, and we too are unwilling to announce such a rule. In view of the limitations that such a burden would place on prosecutors, and in accordance with general evidentiary principles, courts have held that the government may establish the identity of a

drug through cumulative circumstantial evidence. So long as the government produces sufficient evidence, direct or circumstantial, from which the jury is able to identify the substance beyond a reasonable doubt, the lack of scientific evidence is not objectionable.

*Id.* at 334 (citations omitted).

Although defendant acknowledges our statements in *Schrock* in his brief, he argues that this case is distinguishable because the government's expert witness in this case testified that as a chemist she would never conclude that a substance was crack cocaine simply by its appearance. While the distinction noted by defendant may be true, such a factual difference does not belie our holding in *Schrock*. So long as the government presented sufficient evidence from which any reasonable trier of fact could find that the essential elements of the offense were met, the conviction must be affirmed. Because the evidence presented satisfied this standard, we conclude that defendant's arguments are meritless.

### C.

Prior to trial, the government informed defendant of its intent to introduce testimony under Federal Rules of Evidence 403 and 404(b) concerning defendant's drug-related conduct in June 1991, which had not been charged in the indictment. After the jurors were sworn, the district court heard oral arguments as to the admissibility of that evidence. The government argued that the evidence was admissible, stating:

Your Honor, as I indicated in the notice of motion I filed, really it's a matter, in my opinion, for very little debate. The alleged drug dealing took place in June in Clarksville at the apartment 13–C, at the home of Connie Marie Daniels, same as the *modus operandi* in June of 1991. It took place one month previously. It's close in time. There's not a long or lengthy span of time intervening the alleged prior bad act, and what's alleged in the indictment during July and August.

Also the other similarity is that involves crack cocaine, cocaine base. Also that the defendant was armed during that period of time and when he was with other individuals and also corroborated by hotel receipts bearing the name [of defendant] that I expect also, and that's per a handwriting witness who will identify as bearing his signature and his handwriting.

There's, as I indicated in my motion, substantial case law for the Sixth Circuit upholding the admissibility of prior bad acts, particularly in drug cases where it bears on intent, and lack of accident or mistake and the significant number of criteria under Rules 404 and 403 for the admission of this evidence.

Tr.—Voir Dire 130.

Defendant objected to the admission of evidence related to defendant's conduct in June 1991, arguing that any probative value was substantially outweighed by unfair prejudice to him. The district court ruled in favor of the government, stating:

Well, I find that the evidence is relevant and that it's admissible for—permissible purpose to prove identity, lack of accident or mistake, opportunity means, that is, when they got here in July and August, that they had contacts established with this Connie Marie Fields and a *modus operandi* of moving from motel to motel and access as people from Ohio to this housing project in Clarksville, so I find that it's relevant, and that it's offered for a permissible purpose, and that the probative value of it is outweighed by—any potential prejudicial effect, sense of unfair prejudice, is outweighed by its probative value. That it establishes there was the *modus operandi*, there was an established recognizable scenario. I have heard extensive proof in this, two full days of a suppression hearing, and including one of those all day Saturday sessions, and there's a recognizable scenario, and to the extent that this proof about the uncharged conduct that's offered for purposes of showing absence of mistake or accident, intent, opportunity, fits into that recognizable scenario, it's relevant, it's for a permissible purpose and its probative value outweighs any unfair prejudice in the court's judgment and I'll permit it.

**1442**

Tr.—Voir Dire 137–38. On appeal, defendant argues that the district court's decision constituted reversible error, taking the position that admission of his conduct in June 1991 "was highly prejudicial, and its prejudicial value substantially outweighed any possible probative value." Appellant's Brief 48–49.

Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

■ Our review of a district court's ruling with respect to the admission of prior acts is comprised of three inquiries. First, we ask whether the district court's determination that the prior acts occurred constituted clear error. *United States v. Gessa*, 971 F.2d 1257, 1261–62 (6th Cir.1992) (en banc). Second, we determine de novo whether the prior acts are admissible for a permissible purpose under Fed.R.Evid. 404(b). *Id.* at 1262. Finally, we consider whether the district court abused its discretion in weighing, under Fed. R.Evid. 403, the probative value of the evidence against the prejudicial effect.[10] *Id.;* see also *United States v. Fountain*, 2 F.3d 656, 667 (6th Cir.) ("Thus, under Rule 404(b), we review for abuse of discretion only that component of the district court's evidence ruling that invokes the balancing of the probative value of the other acts evidence against its prejudicial effect. We review the underlying admissibility of the other acts evidence under a de novo standard," (citation

omitted)), *cert. denied,* —— U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993).

■ Based on our three-pronged analysis, we conclude that the evidence of defendant's prior acts was properly admitted. The evidence of defendant's acts in June 1991 included testimony of Daniels, who stated that she permitted defendant to sell crack cocaine out of her apartment in June 1991 and that she observed defendant in possession of a firearm at that time; testimony of Watkins, who testified that she observed defendant's selling drugs from Daniels' apartment in June 1991; and testimony of Fields, who testified that he helped defendant sell crack cocaine in June 1991. Given the nature of their testimony, we conclude that it was neither clearly erroneous nor an abuse of discretion for the district court to admit evidence of these prior acts. *Gessa*, 971 F.2d at 1261–62.

Moreover, we conclude, based on our review of the record, that the evidence presented was relevant for at least two Rule 404(b) purposes. First, this evidence was admissible as to defendant's intent to distribute crack cocaine in July and August 1991. See *United States v. Rodriguez*, 882 F.2d 1059, 1064–65 (6th Cir.1989) (evidence of previous drug transaction relevant as showing intent, plan, and knowledge of defendant's later criminal activity), *cert. denied,* 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990); *United States v. Robison*, 904 F.2d 365, 368 (6th Cir.) (evidence of previous narcotic deals suggests that defendant did not intend to merely use drugs), *cert. denied,* 498 U.S. 946, 111 S.Ct. 360, 112 L.Ed.2d 323 (1990). Second, it was admissible to establish defendant's plan to carry out the conspiracy charged. Evidence is relevant to prove "plan" if its purpose "is to establish the doing of a criminal act as a step toward completing a larger criminal plan." *Fountain*, 2 F.3d at 667. Here, the defendant's conduct in June 1991 was similar to his subsequent conduct in July and August 1991; namely, he followed a pattern of moving from motel to motel, and

---

10. Fed.R.Evid. 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

he used some of the same people to help him distribute the crack cocaine. Further, the conduct was sufficiently near in time to the offenses charged in the indictment. *See United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir.1985) (acts similar in nature occurring two to four years prior were sufficiently near in time to charged offense).

Finally, we conclude that the district court did not abuse its discretion in concluding that the probative value of the prior acts was not substantially outweighed by the danger of unfair prejudice. Rule 404(b) safeguards against "the idea that one who commits a crime probably has a defect of character, and that someone who has such a defect is more likely than others to have committed the act in question." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 404[08] (1993). The district court minimized any possible prejudice arising from the admission of prior acts, however, by giving a limiting instruction to the jury prior to the admission of the evidence, *see United States v. Feinman*, 930 F.2d 495, 499 (6th Cir.1991), and at the close of the evidence, which informed the jury that it was to consider the evidence only for the purposes set forth in Fed.R.Evid. 404(b). Given the broad discretion a district court has in weighing the probative value of evidence against its prejudicial effect, *see United States v. Dabish*, 708 F.2d 240, 243 (6th Cir.1983), and the presumption that a jury follows the instructions presented, *see Richardson v. Marsh*, 481 U.S. 200, 206–07, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987), we conclude the district court properly admitted the evidence of defendant's prior acts.

### III.

For the reasons stated, the judgment of the district court is AFFIRMED.