06-1207-cr
USA v. Chirino

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: December 7, 2006          Decided: April 12, 2007)


Docket No. 06-1207-cr

_____

UNITED STATES OF AMERICA,

                                        Appellee,

                         - v. -

WALTER CHIRINO,

                                        Defendant-Appellant.
_____

Before:  KEARSE, McLAUGHLIN, and STRAUB, Circuit Judges.

          Appeal from a judgment of the United States District Court for the Eastern District of New York, Denis R. Hurley, Judge, convicting defendant, a previously convicted felon on probation, of possessing of a firearm in violation of 18 U.S.C. § 922(g)(1).

          Affirmed.

          Judge McLaughlin concurs, in a separate opinion.

                    SUSAN CORKERY, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Peter A. Norling, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

                    NORMAN TRABULUS, Garden City, New York, for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Walter Chirino appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York, following his conditional plea of guilty before Denis R. Hurley, Judge, to one count of possession of a firearm by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). Chirino was sentenced principally to 37 months' imprisonment, to be followed by three years' supervised release. On appeal, he contends that the district court should have granted his motion to suppress (1) the firearm, discovered in his dresser drawer during a warrantless search by probation officers and other law enforcement officers, and (2) a statement made in the course of his arrest following discovery of the gun, arguing principally that the search was not supported by reasonable suspicion, and hence was unlawful, and that his statement was a product of that search. For the reasons that follow, we affirm the judgment of conviction.

I.  BACKGROUND

In 2001, Chirino was convicted in Suffolk County, New York ("Suffolk County" or "County"), of third-degree robbery, a Class D felony, see New York Penal Law § 160.05 (McKinney 1999), punishable by up to seven years' imprisonment, see id. § 70.00(2)(d). The Suffolk County Court sentenced him to six months' imprisonment, to be followed by a five-year period of probation.

Federal law makes it unlawful for any person to possess a firearm that has been shipped or transported in interstate commerce

if that person has previously "been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1), regardless of the prison term actually imposed, see, e.g., Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 113 (1983) (the word "punishable" in § 922(g) makes it "plainly irrelevant . . . whether the individual in question actually receives a prison term" (emphasis in original)). The present prosecution was initiated after a warrantless search of Chirino's bedroom in 2004, by a County probation officer and a County police officer, turned up a firearm in Chirino's dresser drawer. The events leading to that discovery, as found by the district court, whose factual findings are largely unchallenged on appeal, and as described at a suppression hearing principally by Suffolk County Probation Officer José Martorell, whose testimony the district court credited, were as follows.

A.   The Conditions of Chirino's Probation

Among the conditions of probation imposed on Chirino by the County Court in 2001 were the requirements that he notify his probation officer prior to any change of address, see Suffolk County Court Probation Order dated October 26, 2001 ("Probation Order"), ¶ 3, and that he "permit the probation officer to visit his . . . place of abode or elsewhere," id. ¶ 1. Chirino was also required to "[r]efrain from violating any federal, state or local law." Id. ¶ 4.

In addition, Chirino was expressly prohibited from, inter alia, using and/or possessing any illegal drugs. See, e.g., id.

¶ 11(e). In connection with this prohibition, he was required to "[p]ermit search of [his] person" and "[p]ermit search of [his] vehicle and place of abode where such place of abode is legally under [his] control," with "such search[es] to be conducted by a probation officer or a probation officer and his agent." Id. ¶¶ 11(a) and (b). Chirino was also expressly "[p]rohibited from possessing any firearms, weapons or dangerous instruments," id. ¶ 15; and he was required to "submit to the search of home, vehicle and person by a probation officer to determine compliance with this prohibition," id.

In mid-2003, the Suffolk County Probation Office received information that Chirino was a member of a street gang known as MS-13. As a result, responsibility for the supervision of his probation was transferred from his original probation officers to County Probation Officer Matt Porter, assisted by Martorell. Martorell was in charge of the probation office's "gang unit," which was concerned with probationers who were members of gangs.

In late January 2004, Chirino informed Porter and Martorell that he was moving to a new address, on Long Shore Avenue in Bay Shore, New York ("Long Shore Avenue"). The probation officers planned to make their first visit to Chirino's new home on February 6. On February 4, however, they received information from Suffolk County Police Sergeant John Oliva that caused them to advance the date of that visit.

B. The Search for the Missing Girl

In late January, Oliva, who was a member of a police unit

-4-

that worked jointly with the Federal Bureau of Investigation ("FBI") to deal with street gangs, received information from a confidential informant that a girl who appeared to be 13 or 14 years of age was hanging out with members of the MS-13 gang. In communications on February 1st, 2nd, 3rd, and possibly the 4th, the informant indicated that the girl, whom the authorities ultimately identified (hereinafter called "Bonilla"), had been seen with members of MS-13 on each of those days. On February 1, she had been seen with approximately eight members of MS-13, several of whom the informant identified by name. The informant reported that Bonilla was being sexually abused by numerous members of MS-13, passed around from member to member, and that she was perhaps being held against her will.

The informant had been a confidential informant for more than a year. During that period, members of MS-13 had been arrested on the basis of information he provided; Oliva had verified all of the informant's information and found none of it to be erroneous.

After speaking with his informant on February 4, 2004, Oliva telephoned Porter and asked whether there was an outstanding PINS warrant (i.e., a warrant for the arrest of a "person in need of supervision") for Bonilla, a 14-year-old girl who had been missing for two weeks. When Porter responded affirmatively, Oliva relayed the information he had received from the informant and asked whether any MS-13 members were probationers. Porter responded that Chirino and one other County probationer were members of MS-13. Oliva stated that one of the MS-13 members whom the confidential informant had identified as being with Bonilla on February 1 was Chirino.

Porter contacted Martorell, whose 9 a.m. to 5 p.m. shift by then had ended, and the probation officers decided not to wait until February 6 to visit Chirino's new home but to make their first visit immediately, on the evening of February 4. Porter and Martorell met at 8 p.m. with Oliva, FBI agents, and other police officers, all of whom would accompany the probation officers, to plan the visit to Chirino's home, as well as a visit to the home of the other probationer who was an MS-13 member. At about 10:30 or 10:45 p.m. on February 4, Martorell went to Chirino's Long Shore Avenue address, accompanied by two FBI agents and a police officer. (Oliva and Porter initially went to the home of the other probationer; finding that he was not at home but being allowed to inspect his room and determine that Bonilla was not there, Oliva and Porter shortly joined the law enforcement agents at Chirino's residence.) The two purposes of the visit to Chirino's new address were to determine that it was indeed his home and to determine whether Bonilla was with, or had been in the company of, Chirino.

At Chirino's residence, the officers knocked on the front door, which was answered by the owner of the house and his son Edward Galdez. The officers identified themselves, asked if Chirino was present, and were informed that Chirino lived in the basement. Galdez escorted the officers to the basement. Knocks on an unmarked door, which led to an anteroom that the officers only later learned was Chirino's living room (Chirino's prior residence had consisted of a single rented bedroom), went unanswered. Galdez opened the door, which was not locked, and pointed to a second closed door, telling the officers that it led to Chirino's bedroom. The officers

- 6 -

passed through the anteroom, looking only from side to side for safety, and knocked on that second door. After a short delay, the door was opened by Chirino.

The bed in the small (8' x 10') bedroom was so positioned that Chirino could open the door without leaving the bed. When the door opened, the officers found Chirino in bed between two young girls who were under the covers, dressed in night clothes; Chirino wore only boxer shorts. When Chirino was asked who the girls were, he stated that one was his cousin and the other was her friend. However, he did not know his "cousin's" last name, or where she lived, or her parents' names. Eventually, the officers learned the identities of the girls, who turned out to be 13 and 14 years of age (Chirino was 23). Both girls were the subjects of outstanding PINS warrants, but neither of them was Bonilla.

In the meantime, Martorell informed Chirino that the officers were going to conduct both a search for Bonilla and a probation search. Martorell testified that

> [i]f . . . there is reason to believe [a probationer is] involved in gang activity, or there is a source or information from . . . police that this person is actually involved or is active in gang activity, that would give us a reason to make sure that he is complying with the conditions of probation, that he has no firearms, no drugs and no alcohol.

After the other agents had taken Chirino to the living room and the girls to another part of the basement, Martorell began searching Chirino's bedroom closet, on the chance that he might find Bonilla or some of her clothing or some other indication that she had been there. When Oliva arrived, Martorell asked him to search the dressers.

As Oliva felt around in one of the dresser drawers, he found a loaded .380 pistol, whose serial number had been defaced. He discreetly signaled his discovery of the gun to Martorell. Oliva then went into the living room and placed handcuffs on Chirino; as he did so, Chirino said, "[y]ou got me." Oliva asked whether there were any other guns present; Chirino responded, "[t]hat's the only gun I have."

## C.   The Present Prosecution and Chirino's Suppression Motion

Chirino was indicted on one count of being, as a previously convicted felon, in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and on one count of possessing a firearm with a defaced serial number, in violation of 18 U.S.C. § 922(k). He moved to suppress both the gun found in the search and the statements he made following that discovery. He argued that the search violated his rights under the Fourth Amendment because he had not voluntarily consented, that the search exceeded the scope authorized by the Probation Order, and that his statements were the product of the unlawful search.

A suppression hearing was held, at which Martorell, Oliva, and others testified. In a decision announced from the bench on October 7, 2005, the court denied the motion to suppress the gun and the "[y]ou got me" statement. See Transcript, October 7, 2005 ("Decision Tr."), at 27. In a subsequent order, the district court granted the motion to suppress Chirino's statement "[t]hat's the only gun I have," ruling that that statement was a response to a question posed after Chirino had been placed in custody and before

- 8 -

he had been given Miranda warnings. See Memorandum and Order dated November 4, 2005, at 1-2, 5-6. The government has not appealed the latter ruling.

With respect to the rulings at issue on this appeal, denying Chirino's motion to suppress the gun and the "[y]ou got me" statement, the court held that the officers' entry into the living room of Chirino's apartment was lawful, both because it was reasonable for the officers to believe that that room was not part of Chirino's apartment--given that they had not previously visited Chirino at that location, that the door was opened by Galdez, and that the door was unmarked and unlocked--and because the information with respect to Bonilla bespoke exigent circumstances. See Decision Tr. 8-9, 21-22. The entry to Chirino's bedroom was ruled lawful because the door to that room was opened by Chirino. See id. at 23. Without making a finding as to whether or not Chirino had consented to the ensuing search of his bedroom, the court found that the search was lawful because it had been initiated and controlled by a probation officer and was based on reasonable suspicion that Chirino was violating the conditions of his probation. See id. at 11, 14-15, 24. The court stated:

> The two girls were under the covers in the bed. The two girls were dressed in nightclothes. The defendant was dressed in boxer shorts.
>
> Now, a juxtapositioning of what the officers saw after the defendant opened the second door, with one of the reasons, that being one of the two reasons that the officers had gone to that location, certainly gave rise to reasonable suspicion. Reasonable suspicion of what? Reasonable suspicion that the defendant was violating a condition of his probation.

One of the conditions of his probation is that he's not to be involved in any type of criminal activity. He is seen in the presence of two children, female children, in a bed, under circumstances that would certainly suggest that inappropriate conduct was occurring.

Id. at 11. The court concluded that,

given what the officers saw once the defendant opened the second door, it seems to me they definitely had reasonable suspicion to believe the defendant was violating conditions of his probation by being inappropriately involved with underaged girls, i.e., children apparently 14 years of age or younger.

Id. at 24.

Further, the court reasoned that the reports, from an informant of proven reliability, that Bonilla was being subjected to sexual abuse by numerous members of MS-13 indicated

exigent circumstances. The officers have the following information at the time when the search was commenced. A girl has been missing for two weeks. She's 14 years of age. Information from a confidential informant indicates that she is being abused sexually by members of the MS 13 gang.

The confidential informant also confirmed that information on the first, the second, and the third, and possibly the fourth, but certainly on the first three days of February. We also have information from that same informant that the defendant, along with seven others, was with her on the preceding Sunday.

Under those circumstances, it seems imperative that all reasonable efforts must be taken to locate the missing child.

Decision Tr. 24-25.

As to "whether the search should have ceased once it was determined that neither of . . . the 14 year old girls who were in bed with" Chirino was Bonilla, id. at 25, the court answered that question in the negative.

It's true, of course, as defendant underscores, that Ms. Bonilla could not be hiding in a drawer. The gun was found in a drawer. But I think that's a simplistic approach to what was appropriate for the officers to do under the circumstances. Ms. Bonilla was missing. She was being subjected to criminal conduct.

It may be that she was located in the bedroom, but the search readily indicated she was not. But that doesn't mean that it would not be reasonable to believe that a further search would uncover evidence that she had been there. A search of the bureau might have produced, for example, items of her apparel or other information that may have helped the officers to find her. Which is to say, a continuation of the search was reasonable under the attendant circumstances.

Id. at 25-26. Accordingly, the district court concluded that the officers' conduct did not violate the Fourth Amendment.

Following the court's rulings on the motion to suppress, Chirino and the government entered into a plea agreement. The government agreed to the dismissal of the § 922(k) count of the indictment; Chirino agreed, with the approval of the court, to enter a conditional plea of guilty to the § 922(g)(1) count, reserving the right to appeal so much of the court's order as had denied his suppression motion.

## II.  DISCUSSION

The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

United States v. Knights, 534 U.S. 112, 118-19 (2001) (quoting

*Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). In determining the reasonableness of the search of a person who is on probation, we are to follow the "general Fourth Amendment approach of 'examining the totality of the circumstances,' *Ohio* v. *Robinette*, 519 U.S. 33, 39 (1996), with the probation search condition being a salient circumstance." *Knights*, 534 U.S. at 118.

A defendant's "status as a probationer subject to a search condition informs both sides of th[e] balance." *Id*. at 119. "Inherent in the very nature of probation," which is one point on a continuum of possible punishments imposed on a person who has been convicted of a crime, is that "probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id*. (internal quotation marks omitted). Inherent in authorized supervision is a diminution of the probationer's right to privacy. *See*, *e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987).

On the other side of the scale, the government has a heightened interest in conducting supervision when a person is placed on probation. Part of that interest concerns the probationer's rehabilitation and his reintegration into the community; but another part of the government's concern is an "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise." *Knights*, 534 U.S. at 121. The *Knights* Court noted that "'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" *Id*. at 120 (quoting *Griffin*, 483 U.S. at 880, and citing statistics on recidivism). It also noted that "probationers have even more of an

- 12 -

incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal," knowing that they are subject to supervision and to punishment for probationary infractions "in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." Knights, 534 U.S. at 120. Accordingly, the Knights Court concluded that

> [w]hen an officer has <u>reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity</u>, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

Id. at 121 (emphasis added). In such circumstances, the reasonableness requirement of the Fourth Amendment is satisfied without a warrant. See id.

In the present case, the district court ruled that the officers' entries into the anteroom and Chirino's bedroom were lawful. See Decision Tr. at 21-22. Chirino does not challenge those rulings. (See Chirino brief on appeal at 4.) Nor does he dispute the court's finding that "[n]o search was conducted of the area behind the first door," Decision Tr. at 10, a finding that is supported by the uncontradicted evidence that the officers did not know this area was part of Chirino's apartment and that, in proceeding through that area to the door to Chirino's bedroom, the officers merely looked from side to side for safety. "[A] truly cursory inspection--one that involves merely looking at what is already exposed to view, without disturbing it--is not a 'search' for Fourth Amendment purposes." Arizona v. Hicks, 480 U.S. 321, 328

(1987).

Rather, Chirino contends that his Fourth Amendment rights were violated by the officers' search of his bedroom including, in particular, the search of his dresser drawers, arguing that the search was not supported by reasonable suspicion, was not authorized by the Probation Order, and was not justified by exigent circumstances. Reviewing the district court's factual findings for clear error and its legal conclusions de novo, and assessing the reasonableness of the search in light of the totality of the circumstances known to the officers at the time the search was begun, we disagree.

A.  The Conditions of Chirino's Probation and the Circumstances
    Known or Suspected by the Officers

The conditions imposed on Chirino by the Probation Order plainly diminished his right of privacy. Prohibited from violating any federal, state, or local law, see Probation Order ¶ 4, Chirino was required to permit probation officers to visit his "place of abode or elsewhere," id. ¶ 1. In connection with the prohibition against his use or possession of illegal drugs, see id. ¶ 11(e), he was required to permit probation officers to search his person and his vehicle, as well as his home to the extent that it was legally under his control, see id. ¶¶ 11(a) and (b). He was also required to submit to the search of his person, vehicle, and home by probation officers to determine whether he was complying with the prohibition against his possession of firearms or other weapons. See id. ¶ 15. The district court correctly found that Chirino's

- 14 -

"status as a probationer diminishe[d] his reasonable expectation of privacy." Decision Tr. at 12.

The record also amply supports the district court's finding that the search of Chirino's bedroom did not violate his rights under the Fourth Amendment because it was, <u>inter alia</u>, based on reasonable suspicion that Chirino was engaged in criminal activity. Before the officers initiated the search, they knew that Chirino was a member of the MS-13 street gang. They had information originating from a reliable informant that Bonilla, a 14-year-old girl for whom a PINS warrant was outstanding, had been seen virtually every day for the past several days in the company of members of MS-13; that she had been sexually abused by numerous members of that gang; that a few days earlier, Bonilla had been seen with Chirino; and that Bonilla was perhaps being held against her will. In addition, upon Chirino's opening the door to his bedroom, the officers had found Chirino, clad only in boxer shorts, in bed with two young girls; the girls' ages appeared to be similar to Bonilla's age, <u>i.e.</u>, well below the age of consent; and the officers learned that Chirino did not know the girls' surnames or their addresses. These facts known to the officers prior to their search plainly gave them grounds for at least a reasonable suspicion that Chirino was engaged in criminal activity.

The fact that the officers learned while the search was ongoing--and before the discovery of the gun--that neither of the girls found with Chirino was Bonilla, and that Bonilla was not in the bedroom closet, did not require the immediate cessation of the search. Martorell had announced that he was conducting not only a

search for Bonilla but also a probation search. The confirmed absence of Bonilla did not lessen the grounds for suspecting that Chirino had violated the terms of his probation by engaging in illegal activity with the two girls who were present. Nor did the absence of Bonilla diminish the authority of the probation officers to search for weapons or illegal narcotics as provided by the Probation Order. And the officers' knowledge that Chirino was a member of the MS-13 gang, that he had been seen with Bonilla, and that Bonilla was perhaps being held by MS-13 members against her will justified the continuation of the search of Chirino's bedroom for drugs or weapons that could be used to overcome a person's will.

Finally, the exigent circumstances that led the probation officers to expedite their visit to Chirino's home did not abate with the discovery that Bonilla was not then there. The urgency of the need to find Bonilla, who was reportedly being passed around from gang member to gang member for the purpose of sexual abuse, remained. And the fact that Chirino had been found nearly naked in bed with two other underage girls, about the same age as Bonilla, increased the likelihood that the informant's report that Chirino had recently been with Bonilla herself was accurate, and that enhanced the possibility that Chirino might have in his bedroom information relating to Bonilla's whereabouts.

In sum, the search of Chirino's bedroom, including the furniture in that room, was justified by Chirino's diminished expectation of privacy as a probationer and the officers' reasonable suspicion that Chirino had engaged in unlawful activity with Bonilla and the two young girls with whom he was found.

B.  The Alleged Noncompliance With State-Law Procedures

Chirino also contends that the district court should have granted his motion to suppress because his "conditions of probation did not authorize probation searches generally, or for clothing or evidence in general, just searches for specific classes of contraband: narcotics, narcotics implements, firearms, weapons, or dangerous instruments" (Chirino brief on appeal at 12), and under New York law, a search beyond the conditions delineated in the probation agreement requires prior court authorization, see N.Y. Crim. Proc. Law § 410.50(3).  Again, we disagree.

While state-law rules and practices may inform our evaluation of the totality of the circumstances, "the appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment . . . . because the exclusionary rule is only concerned with deterring Constitutional violations." United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994); see id. at 1434 (the fact that state law "may . . . require greater protection against searches and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime" (internal quotation marks omitted)); see also Griffin, 483 U.S. at 880 n.8 (where a search passes the Fourth Amendment reasonableness test, the fact that it may have violated state regulations is irrelevant to the constitutional analysis); United States v. Miller, 116 F.3d 641, 662-63 (2d Cir. 1997) (even a state-law-based suppression order in a state proceeding would not be binding on the district court in

considering a motion to suppress in a federal-court proceeding), cert. denied, 524 U.S. 905 (1998).

Thus, even assuming arguendo that the search of Chirino's bedroom exceeded the scope authorized by the Probation Order and New York law, that would not require the district court to find the search unreasonable in light of all the circumstances discussed above.

## CONCLUSION

We have considered all of Chirino's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.

McLAUGHLIN, Circuit Judge, concurring:

I agree with my colleagues that reasonable suspicion supported the search at issue here. I write separately only to note my continuing belief that something less than reasonable suspicion may support a search of the dwelling of a felon on probation.

The Supreme Court has remained expressly agnostic on this question. See United States v. Knights, 534 U.S. 112, 120 n.6 (2001). Our court, too, has noted that probationary searches may be permissible if based upon reasonable suspicion, "or potentially a lesser standard." United States v. Lifshitz, 369 F.3d 173, 181 (2d Cir. 2004).

We recently refused, however, to interpret Knights as permitting suspicionless searches in the absence of a "special need" beyond law enforcement, or a similar exception. Nicholas v. Goord, 430 F.3d 652, 666 (2d Cir. 2005). We promised to follow this "more prudent" course until the Supreme Court clarified its Fourth Amendment jurisprudence. Id.

That time has come. Last year's decision in Samson v. California, 126 S. Ct. 2193 (2006), has fatally undermined the "prudent" reading of Knights. In approving the use of a general balancing test for suspicionless parolee searches, the Court admonished that it has "never held that ['special needs' scenarios] are the only limited circumstances in which searches absent individualized suspicion could be 'reasonable' under the Fourth Amendment." Id. at 2201 n.4.

It is not a great leap from the conditioned parole of Sampson to a conditioned probation—though it may be an important one. Cf.

id. at 2198 (noting that "parolees have fewer expectations of privacy than probationers"). Distinctions could also be drawn upon the particular release conditions imposed upon a defendant. Compare id. at 2199, with Knights, 534 U.S. at 114.

Inevitably, however, a case will arise in which a suspicionless search of a probationer occurs absent a "special need" or similar exception. I believe that the propriety of that search would present an open question of constitutional law in this Circuit after Samson.