# United States Court of Appeals

## For the First Circuit

No. 07-2299

UNITED STATES OF AMERICA,

Appellee,

v.

DEREK GRAHAM,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Baldock*, and Selya, Circuit Judges.

Martin J. Vogelbaum, Assistant Federal Public Defender, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

January 9, 2009

---

*Of the Tenth Circuit, sitting by designation.

**HOWARD**, <u>Circuit Judge</u>. Appellant Derek Graham was on probation in Massachusetts for various drug offenses. When he failed to comply with probation reporting requirements, the police secured a warrant for his arrest. To execute this warrant, officers entered an apartment, and, after finding Graham in one of the apartment's bedrooms, they arrested him and searched the room. The search yielded a sawed-off shotgun and ammunition. Based on this evidence, a federal grand jury charged Graham with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

Graham sought to suppress the evidence, arguing that the police violated the Fourth Amendment of the United States Constitution in acquiring it. After the district court resolved the suppression motion against Graham, he entered a conditional guilty plea, reserving the right to appeal the suppression ruling. He now exercises that right.

Graham argues that both the officers' entry into the apartment and the subsequent search of the bedroom where he was arrested violated the Fourth Amendment. He claims that because he was a social guest in the apartment, the police needed to first obtain a search warrant to enter the apartment, in addition to the arrest warrant they had procured. Additionally, he argues that even if the arrest warrant justified the entry into the apartment,

the police still needed a search warrant to conduct the search of the bedroom.

In response, the government argues that the entry by the officers was permitted under the rule of Payton v. New York, 445 U.S. 573 (1980), because they had a warrant for Graham's arrest, and they reasonably believed prior to entry that Graham resided at the apartment. As for the subsequent search of the bedroom, the government submits that the search was justified as either a valid probation search or a search incident to arrest. We affirm.

## I.

### A. Background

We state the relevant facts as the trial court found them, consistent with record support. United States v. Ruidiaz, 529 F.3d 25, 27 (1st Cir. 2008).

After committing various drug offenses, Derek Graham was sentenced to probation by a Massachusetts state court. The probation order, issued in mid-October 2004, required Graham to comply with several standard conditions. The order also included the following search condition:

> On the basis of a reasonable suspicion that a condition of the probationer's probation has been violated, a probation officer, or any law enforcement officer acting on the request of the probation office, may search the probationer's property, his or her residence, and any place where he or she may be living, and may do so with or without a search warrant, depending on the requirements of law.

Graham signed the probation order, indicating that he had read and understood the conditions of probation.

Although on probation for drug offenses, Graham had previously pled guilty to possessing firearms illegally, and the police connected him with a violent gang in his neighborhood known as the Crown Path Gang. This gang had an ongoing rivalry with a gang from a neighboring area known as the Everton Young Guns.

Graham fell out of compliance with the probation order in late-October 2004, failing to meet the order's reporting requirements. As a result, Graham's probation officer, Thomas Todd (Todd), sought and obtained a warrant for his arrest. Todd understood Graham to be living with his mother in Dorchester, Massachusetts. The police attempted to execute the warrant at this location but did not find him there.

Over the next few months, Todd learned that Graham had potentially violated another one of the conditions of his probation, this one requiring him to obey all local, state, and federal laws. Specifically, another probationer told Todd that Graham had "brandished a weapon on him" and a member of the Everton Young Guns told Todd that the gang suspected Graham was responsible for several shootings of their members.

At first unable to locate Graham, in time the authorities began to hone in on his whereabouts. In May 2005, Todd learned from another probation officer that Graham had been "staying at" a

house on the corner of Harvard Street and Harvard Park. The address of this building was 18 Harvard Street. After receiving the tip, Todd drove by the house. He recalled having previously seen another member of the Crown Path Gang on the house's porch. Todd provided the Boston Police Department with this information. The police then informed Todd of a report of a domestic incident at 18 Harvard Street, identifying Graham as the offender. The report stated that Chanice Meadows (Chanice) alleged that she had been threatened by her daughter's boyfriend, Derek Graham. The report listed Graham's address as 18 Harvard Street.

Based on this information, a magistrate added the 18 Harvard Street address to the arrest warrant for Graham. Todd again contacted the Boston Police Department and requested that the warrant be executed. Todd informed the police that Graham might be armed, that Graham was subject to a probation search condition, and that a probation officer would be available to perform the probation search if Graham were found. The police informed Todd that the warrant would be executed the next day, a Saturday.

Around 7 a.m. on Saturday morning, police officers went to 18 Harvard Street with the arrest warrant. They showed a picture of Graham to the person who answered the door and were directed to the third-floor apartment. Chanice answered the door to the apartment but denied that Graham was present. The officers

informed Chanice that they had a warrant and entered the apartment to look for Graham.

They discovered Graham in the apartment's rear bedroom. The officers noticed a number of items in the room, including men's clothes on the floor and in a duffel bag, several boxes of shoes against a wall, men's toiletries on a bureau next to a bed, and a newspaper clipping and several pictures on a wall in the room. The newspaper clipping concerned the murder of a member of the Everton Young Guns -- the Crown Path Gang's rival gang -- and the pictures were of individuals making hand-signs associated with the Crown Path Gang.

The officers arrested Graham, handcuffed him, and brought him to the living room, which was in the front of the apartment. They then contacted the probation officer on duty, who arrived at the apartment fifteen minutes later with copies of Graham's probation documents. The probation officer asked the officers to search the bedroom where Graham was found. In the course of this search, the police found a sawed off shotgun and ammunition in the drawer of a dresser. The officers also discovered a small safe underneath the bed. Using a knife, an officer opened the safe and discovered various types of ammunition.

## B. State court proceeding

Massachusetts charged Graham with possession of a shotgun and ammunition in violation of state law. Graham moved to suppress

the evidence. After a suppression hearing, the state court granted Graham's motion.

The state court concluded that the officers' entry into the apartment was justified under Payton because the officers reasonably believed that Graham resided at the apartment. The court, however, determined that the subsequent search of the room where Graham was found violated Graham's rights under the Massachusetts Declaration of Rights in the Massachusetts constitution. The court explained that article 14 of the Massachusetts constitution, as interpreted by the Supreme Judicial Court of Massachusetts in Commonwealth v. LaFrance, 525 N.E.2d 379 (1988), barred probation searches executed without a search warrant unless "one of the established exceptions to [the search warrant] requirement" applied. Finding that no such exception applied in Graham's case, the state court suppressed the evidence.[1]

## C. **Federal district court proceeding**

Subsequent to the state court's resolution of the suppression issue, the United States charged Graham in federal court with being a felon in possession of a firearm and ammunition.

Like the state court, the federal court concluded that the police entry into the apartment was permissible under Payton. The court ruled in the alternative that the probation order itself

---

[1] Although a search incident to arrest is an established exception to the warrant requirement, state prosecutors did not argue that the evidence was seized as a result of a search incident to arrest.

allowed the officers to enter the apartment. Unlike the state court, however, the district court concluded that the police did not need a search warrant to search the room where Graham was found.

The district court determined that the police collected the evidence from the bedroom pursuant to a valid probation search. Relying on United States v. Knights, 534 U.S. 112 (2001) and Samson v. California, 547 U.S. 843 (2006), two cases analyzing warrantless searches of defendants on conditional release,[2] the court concluded that as a probationer, Graham had such a reduced expectation of privacy that a warrantless search was reasonable under the Fourth Amendment. The court rejected Graham's argument that the search violated the Fourth Amendment because the police, in defiance of state law, failed to obtain a search warrant. The court determined instead that the admissibility of evidence in a federal proceeding is governed solely by federal law, and federal law did not require a search warrant.

The court also stated that an alternative basis for upholding the search, viz., that it was a valid search incident to arrest. Although Graham had been handcuffed and removed from the room prior to the search, the court determined that the areas

---

[2] Probation, parole and supervised release are forms of conditional release. United States v. Weikert, 504 F.3d 1, 7 n.4 (1st Cir. 2007).

searched and items seized were within his reach at the time of his arrest.

## II.

When reviewing the disposition of a suppression ruling, we review the district court's factual findings for clear error and its ultimate constitutional conclusion de novo. United States v. Nascimento, 491 F.3d 25, 50 (1st Cir. 2007).

### A. The entry into the apartment

Graham first challenges the initial entry into his apartment, understanding that if we find this entry unjustified the evidence discovered subsequent to it must be suppressed. Graham contends that because he did not "reside" at the apartment, because he was merely an overnight guest, the police needed a search warrant in order to enter the apartment, in addition to the arrest warrant that they procured. He also argues that the entry into the apartment was not permissible under Payton, because the officers did not "reasonably believe" that he resided in the apartment. The government disagrees, contending that the arrest warrant itself, coupled with evidence supporting a reasonable belief that Graham resided in the apartment, was sufficient under Payton to permit entry into the apartment.

Payton is the lodestar. In that case, the Supreme Court held that police armed with an arrest warrant for a suspect founded on probable cause may enter the dwelling of that suspect when

-9-

"there is reason to believe [he] is within." 445 U.S. at 602. Subsequent to Payton, courts have held that even where it is discovered after entry that the dwelling is not the suspect's, the initial entry may be justified under Payton provided the police reasonably believed, prior to entry, that the suspect did reside at the dwelling. United States v. Lovelock, 170 F.3d 339, 343-44 (2d Cir. 1999) (observing that although Payton requires that the entering officers reasonably believe that the subject of the arrest warrant resides at the place entered, that belief need not ultimately be correct); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996) ("The officers' assessment need not in fact be correct; rather, they need only 'reasonably believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling.") (citations omitted)); United States v. Route, 104 F.3d 59, 63 (5th Cir. 1997) (same).

Whether Graham actually "resided" at the apartment, then, is not dispositive so long as the police "reasonably believed" prior to entry that he (1) resided at the apartment and (2) would be present. See United States v. Weems, 322 F.3d 18, 22 (1st Cir. 2003) (citing Unites States v. Gay, 240 F.3d 1222, 1226-27 (10th Cir. 2001), for the proposition that "Payton allows entry because officers had a reasonable belief that subject of arrest warrant lived at the house they entered")); see also United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005). At issue in this case

-10-

is whether the police had a "reasonable belief of residence," and not the second requirement, whether they had "reason to believe" Graham was within the apartment when they entered.

In determining whether the officers possessed a reasonable belief that Graham resided at the apartment, we examine the basis for that belief. United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000) (examining "the facts and circumstances within the knowledge of law enforcement agents . . . viewed in the totality") (citation omitted)); Lovelock, 170 F.3d at 343. Of course, certain facts will almost always give rise to a reasonable belief that the subject of an arrest warrant resides at the place entered. For example, in United States v. Route police concluded that the subject of the arrest warrant resided at the house entered because his credit card applications, utility bill, car registration, and mail were directed to the house. 104 F.3d 59, 62 nn.1 & 63 (5th Cir. 1997). However, the police need not posses such rock-solid indicators of residence in order to form a "reasonable belief" that a suspect resides at a given place.

Two cases from the Eighth Circuit, United States v. Clayton, 210 F.3d 841 (8th Cir. 2000) and United States v. Risse, 83 F.3d 212 (8th Cir. 1996), are instructive. In Clayton, a police record indicated that the defendant resided in a particular house. 210 F.3d at 842-43. Officers were also told by an anonymous caller that the defendant resided at this house and were told by a person

-11-

leaving the house, immediately prior to their entry, that the defendant was inside. The Eighth Circuit concluded that this information "gave police a reasonable belief that Clayton lived at the residence." Id. at 844. In Risse, the subject of the arrest warrant told police that she was "staying" at a certain place and that officers could contact her there. 83 F.3d at 214-15. A confidential informant further told police that the subject was "living" at the same place with another person, and police had been unable to contact the subject at a different, permanent residence she maintained. Id. at 215. The court concluded that this information supported a reasonable belief of residence. Id. at 216-17; see also Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921 (9th Cir. 2001) (discussing information giving rise to reasonable belief); Lovelock, 170 F.3d at 343 (same).

Similarly, we can safely conclude here that the police possessed a reasonable belief that Graham resided at the apartment. The police based their residence determination on five pieces of information. First, they possessed a police report describing a domestic incident that occurred at the apartment. The report listed Graham as the offender and, critically, listed the apartment as Graham's address. Second, another probationer told Todd, Graham's probation officer, that Graham was "staying at" the apartment. See Risse, 83 F.3d at 216-17 (noting police could reasonably interpret colloquial phrase "staying with" to mean

-12-

"living with"); see also Lovelock, 170 F.3d at 344. Third, immediately prior to entering the apartment, officers showed a picture of Graham to a person outside the apartment who pointed the officers towards the apartment. Fourth, Todd, on a prior occasion, saw a member of the gang Graham was associated with on the porch of the apartment. Fifth, officers had been unable to locate Graham where previously he had been living. See Risse, 83 F.3d at 217 (noting that police's inability to locate subject of arrest warrant at a location previously associated with the subject could support a reasonable belief that subject was residing at a different location). Taken together, this information supported a reasonable belief that Graham resided in the apartment.

In challenging this conclusion, Graham criticizes individually each piece of information the officers relied on in forming their belief. But, as established above, we examine the information known to the officers in the totality and not in isolation. See Lovelock, 170 F.3d at 344 (rejecting defendant's argument that police did not possess reasonable belief of residence where defendant sought to "segment, isolate, and minimize each item of evidence that contributed to the existence and reasonableness of the officers' belief").

Graham also points to a litany of facts to support his contention that he did not reside at the apartment. He notes that he did not have a key to the premises, that his clothing was on the

floor and in a duffle bag and not put away in closets and dressers, that he had decorated the bedroom with only a few photos and a news clipping, and that both his shotgun and the safe where he kept his ammunition were "readily portable items." This Monday-morning quarterbacking does nothing to assist our analysis. What the police discovered <u>after</u> they entered the apartment cannot help us determine what the officers could have reasonably believed <u>before</u> entering the apartment. Based on the reasoning provided above, we conclude that the officers were justified in believing Graham resided at the apartment.

Graham also argues that <u>Payton</u> does not determine the outcome here, but rather two other Supreme Court cases, <u>Steagald</u> v. <u>United States</u>, 451 U.S. 204 (1981) and <u>Minnesota</u> v. <u>Olson</u>, 495 U.S. 91 (1990), should govern the analysis.

This argument is easily dismissed. <u>Steagald</u> and <u>Olson</u> merely establish, as relevant to this case, that certain individuals have standing to object to a warrantless entry and search.[3] Those cases did not establish that those challenges would

---

[3] In <u>Steagald</u>, the police, armed with an arrest warrant for a man named Ricky Lyons, entered a home "based on their belief that [] Lyons might be a guest there." 451 U.S. at 213. On these facts, the Supreme Court concluded that the defendant, Gary Steagald, a resident of the house who was not named in the arrest warrant, could challenge the police's failure to obtain a search warrant prior to entering the residence to search for Lyons. <u>See</u> <u>id.</u> at 223. In <u>Olson</u>, the police entered a home for the purpose of arresting Olson, the defendant. 495 U.S. at 94. The police possessed neither an arrest warrant nor a search warrant and did not claim to possess a reasonable belief that Olson resided at the

-14-

necessarily be successful where police entered a premises with <u>both</u> a warrant for an individual's arrest and a reasonable belief that the individual resided at the premises entered. In such a case, <u>Payton</u> permits entry for the limited purpose of arresting the subject of the arrest warrant. <u>See</u> <u>Bervaldi</u>, 226 F.3d at 1267 n.11 (where police "had a reasonable belief" that the subject of the arrest warrant resided at the place entered "<u>Payton</u>, not <u>Steagald</u>, applies"); <u>Pruitt</u>, 458 F.3d at 487-88 (rejecting defendant's argument that <u>Olson</u> required a search warrant where police possessed both an arrest warrant and the reasonable belief that the subject of the arrest warrant resided at the place entered).[4] Here, as established above, <u>Payton</u>'s dictates permitted the police to enter the apartment for the purpose of arresting Graham.

## B.  **The search of the room**

That the officers were justified in entering the apartment does not, however, resolve the issue of whether the

_____

home. <u>See</u> <u>id.</u>. The Supreme Court determined that Olson, an overnight guest, had a reasonable expectation of privacy in his host's home and thus could challenge the warrantless entry under the Fourth Amendment. <u>Id.</u> at 100.

[4] In addition to arguing that <u>Payton</u> permits officers to enter a place for the purpose of arresting the subject of an arrest warrant, the government contends that Graham (a non-resident) cannot even raise a <u>Steagald</u> claim. Both the Supreme Court and this court have left this question open, <u>see</u> <u>Steagald</u>, 451 U.S. at 219; <u>Weems</u>, 322 F.3d at 23 n.3, and we have no need to resolve it today.

evidence should have been suppressed. Although the officers possessed a valid arrest warrant, this warrant only permitted them to seize Graham and did not, standing alone, authorize the search of the bedroom where Graham was found. It is this search that yielded the bounty of evidence that the government introduced against Graham.

The government advances two theories to justify the warrantless search. First, it argues that the search was a valid probation search. The government notes that Graham signed a probation order that allowed law enforcement to search "any place [the probationer may be living]" if the authorities had reasonable suspicion that Graham had violated a condition of his probation. Second, the government contends that even if the search was not a valid probation search, it was a lawful search incident to arrest.

Graham asserts that neither theory of admissibility withstands scrutiny. He contends that the search, in order qualify as a valid probation search, needed to be conducted pursuant to a search warrant. This is because (1) the Massachusetts constitution requires the police, absent a "traditional" exception to the warrant requirement, to obtain a search warrant prior to executing a probation search and (2) the probation order informed him of the search warrant requirement. Graham also disputes the government's claim that the search was a valid search incident to arrest,

because the police searched the apartment after he had been placed in handcuffs and removed from the room.

The government leads with its best punch. We therefore consider first whether the evidence was obtained pursuant to a valid probation search.

Certain relevant principles are well established. To be valid under the Fourth Amendment, a search must be "reasonable." Knights, 534 U.S. at 119 ("The touchstone of the Fourth Amendment is reasonableness"). Typically, to be considered reasonable a search of a home must be supported by probable cause and be executed pursuant to a particularized warrant authorizing the search. See Weikert, 504 F.3d at 6; United States v. Curzi, 867 F.2d 36, 41 (1st Cir. 1989) ("warrantless searches of a dwelling-place are presumptively unreasonable"). However, there are exceptions to the probable cause and warrant requirements, as the reasonableness of any search is ultimately determined by examining the "totality of the circumstances" and balancing on one hand "the degree to which [the search] intrudes upon an individual's privacy" and on the other "the degree to which [the search] is needed for the promotion of legitimate government interests." Knights, 534 U.S. at 118-19.

Where a defendant on probation is challenging a probation search, that fact significantly influences the required balancing. As a conditional releasee, a probationer has a substantially

-17-

diminished expectation of privacy.  Id. at 119 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled"); see also Samson, 547 U.S. at 848 (noting that Knights court concluded that probationers have a reduced liberty interest "by virtue of their status alone"); Weikert, 504 F.3d at 11.  This expectation of privacy can be further shaped by search conditions in the probation order where the order "clearly express[es]" the conditions and the probationer is "unambiguously informed" of them. Knights, 534 U.S. at 119-20; see also Weikert, 504 F.3d at 8 (examining Knights). For example, in Knights, the Supreme Court noted that a probation condition that notified the defendant that he could be searched without a search warrant "significantly diminished [his] expectation of privacy." Knights, 534 U.S. at 119-20; Weikert, 504 F.3d at 8 (noting that the defendant in Knights had an inherently reduced expectation of privacy, which the search condition served to further reduce).

In considering the other side of the balance, that the government has a legitimate interest in searching probationers is beyond question.  "'[T]he very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'"  Knights, 534 U.S. at 120 (quoting Griffin v. Wisconsin, 483 U.S. 868, 880 (1987)).  As the Supreme Court has observed, probationers have "more of an incentive

-18-

to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because [they are] aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." Id. at 120.

Neither party disputes that these principles control the constitutional analysis. They do, however, spar over how this analysis is influenced by one unique aspect of this case. The search here occurred in the state of Massachusetts. The Supreme Judicial Court of Massachusetts, in Lafrance, concluded that while the Massachusetts constitution permits probationary searches founded on "reasonable suspicion," police executing such searches must first obtain a search warrant, absent the availability of a traditional exception to the warrant requirement. 525 N.E.2d at 382.[5] In its opinion, the court proposed that a condition be

---

[5] The Supreme Judicial Court offered the following reasoning for its ruling.

> [Requiring officers to possess] a search warrant [issued] on a proper showing of reasonable cause 'is not an undue burden on the probation officer and provides the protection for the probationer guaranteed by the constitutions [State and Federal] . . . Upholding the warrant requirements for searches of the probationer's home does not impede the dual goals of probation, protecting the public and rehabilitation.

525 N.E.2d at 382-83.

-19-

included in future probation orders to reflect its holding.  The court structured this condition as follows:

> On the basis of a reasonable suspicion that a condition of the probationer's probation has been violated, a probation officer, or any law enforcement officer acting on the request of the probation office, may search the probationer, her property, her residence, and any place where she may be living, and may do so with or without a search warrant depending on the requirements of law.

Id. at 383 (citation omitted).  As it turns out, this is the precise condition to which Graham was subject.[6]

Graham and the government draw different conclusions about the import of LaFrance and the probation condition.  Graham, as he must, concedes that it does not follow that because a search violates the Massachusetts constitution it necessarily violates the Fourth Amendment.  Nevertheless, he argues that because Massachusetts law typically requires a search warrant, and because the search condition in his probation order informed him of this requirement, his expectation of privacy was sufficiently heightened that the Fourth Amendment balance must be struck in his favor.  The government, in turn, relies heavily on the uncontroversial

---

[6] We note that the search condition did inform Graham that he could be searched "with or without a search warrant depending on the requirements of law."  Our resolution of this case does not require us to construe this language as anything other than reflecting the Massachusetts court's conclusion that warrantless searches could be justified if a traditional exception to the warrant requirement applied.

-20-

principle that "federal law governs the admissibility of evidence in federal prosecutions," noting that the Supreme Court has concluded that violations of state laws are not per se violations of the constitution. See Virginia v. Moore, 128 S. Ct. 1598, 1608 (2008) ("it is not the province of the Fourth Amendment to enforce state law"). The government also cites a number of decisions from other circuits that have, in the absence of an applicable law or search condition, upheld warrantless searches based on a reduced level of suspicion. See, e.g., United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005); United States v. Keith, 375 F.3d 346, 350-51 (5th Cir. 2004).

Neither argument perfectly resolves the issue. Graham appears to argue that because conditions of probation shape a defendant's expectation of privacy, searches in violation of those conditions must violate the Fourth Amendment. This is a somewhat more muted version of the easily dismissed argument that state law controls in federal court. Turning to the government's arguments, the government's first salvo, that the Fourth Amendment and not the Massachusetts constitution, controls the analysis, though accurate, somewhat obscures the controlling principles. The Fourth Amendment's totality of the circumstances test does account for a probationer's expectation of privacy, which in turn may be shaped to some degree by state law and by what the state has communicated to the probationer. The Supreme Court appears to have established

-21-

as much in cases like <u>Knights</u> and <u>Samson</u>. <u>Knights</u>, 534 U.S. at 119-20; <u>Samson</u>, 547 U.S. at 852. And although the government cites to a number of cases where courts have upheld searches of probationers based on a reduced level of suspicion in the absence of a relevant law and search condition, we find those cases to be of little help in considering this case where there exists both on point state law and a search condition consistent with that law.

Ultimately, that Graham was notified that Massachusetts state law requires police to possess a search warrant when conducting a probation search is neither dispositive nor inconsequential in the constitutional analysis. Rather, it is one factor in considering the totality of the circumstances. This conclusion is unremarkable. <u>See</u> <u>United States</u> v. <u>Chirino</u>, 483 F.3d 141, 149 (2d Cir. 2007) ("While state-law rules and practices may inform our evaluation of the totality of the circumstances, 'the appropriate inquiry for a federal court considering a motion to suppress evidence by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment . . . because the exclusionary rule is only concerned with deterring Constitutional violations.") (citing <u>United States</u> v. <u>Wright</u>, 16 F.3d 1429, 1437 (6th Cir. 1994)); <u>see also</u> <u>United States</u> v. <u>Gonzales</u>, 535 F.3d 1174, 1182 (10th Cir. 2008) ("Although [] we have indicated that compliance with state law may be relevant to our Fourth Amendment

-22-

reasonableness analysis, we have never held it to be determinative of the constitutionality of police conduct.") (citation omitted).

With the state pronouncements given their proper place in the analysis, the balancing of the relevant interests leads us to conclude that the search in this case was reasonable. As we have noted, the government has a significant interest in monitoring probationers, given their proclivity to both commit and cover up crimes. And Graham's expectation of privacy was greatly diminished by both his status as a probationer and the probation condition in his probation order that expressly informed him that the government could force him to submit to random drug testing and could search him, his property, his residence or a place he may be living based on reasonable suspicion rather than the more protective probable cause standard. Although Graham's probation order did further inform him that police would go through the formal process of obtaining a search warrant before executing a search, that the officers failed to do so does not merit suppression considering the important governmental interests at stake and Graham's inherently diminished expectation of privacy.

Put plainly, we cannot say that where, as here, the police possess reasonable suspicion that a probationer is violating the terms of probation, the Fourth Amendment demands that the police secure a search warrant before executing a probation search. See Moore, 128 S.Ct. at 1606 ("A state is free to prefer one

-23-

search-and-seizure police among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."); see also Lovelock, 170 F.3d at 343-44 ("What a citizen is assured by the Fourth Amendment . . . is not that no government search . . . will occur in the absence of a warrant or an applicable exception to the warrant requirement, but that no such search will occur that is 'unreasonable'") (citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990) (some internal quotations omitted))); Chirino, 483 F.3d at 149-50 (holding that probation search did not violate Fourth Amendment even though the search was conducted without prior court authorization as required under state law).[7] Because we conclude that the evidence was obtained pursuant a valid probation search, we need not reach the government's search incident to arrest argument.

### III. Conclusion

For the reasons provided above, the district court's ruling is affirmed.

**AFFIRMED**.

---

[7] The district court suggested that the police could have conducted a valid probation search even absent any suspicion that Graham had violated the terms of his probation order. It noted, however, that there was ample evidence in the record to support a finding that the police had reasonable suspicion that Graham had done so. As that conclusion has not been challenged, we need not examine whether a suspicionless search would offend the Fourth Amendment.