*United States v. Lajeunesse*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2022

(Argued: March 16, 2023  Decided: November 1, 2023)

Docket No. 22-178

_____

United States of America,

*Appellee*,

v.

Terry Lajeunesse,

*Defendant-Appellant*.

_____

Before:

LEVAL, CHIN, and LEE, *Circuit Judges*.

Terry Lajeunesse, a defendant in a criminal case, appeals from the judgment of conviction entered by the United States District Court for the Northern District of New York (Glenn T. Suddaby, *J.*) convicting him on his plea of guilty to possession and receipt of child pornography, under 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) and 18 U.S.C. § 2252A(a)(2)(A) and (b)(1), and obstruction of justice under 18 U.S.C. § 1512(c)(2), contending that his Fourth Amendment rights were violated by a probation officer's search of his cell phone and a further search by New York State Police, and that the trial court erred in failing to allow him allocution at sentencing. The government contends that his claim as to sentencing allocution is precluded by the appeal waiver he agreed to as a part of his plea agreement. We reject the

1

government's argument and REMAND for resentencing. We reject the defendant's other arguments and AFFIRM the conviction.

> JAMES P. EGAN, Assistant Federal Public Defender, Federal Public Defender's Office, Syracuse, NY, *for Defendant-Appellant*.
>
> PAUL D. SILVER, Assistant U.S. Attorney of Counsel *for* Carla B. Freedman, United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee*.

LEVAL, *Circuit Judge*:

Terry Lajeunesse, a defendant in a criminal case, appeals from the judgment of conviction entered by the United States District Court for the Northern District of New York (Glenn T. Suddaby, *J.*)[1] convicting him on his plea of guilty to one count of possession of child pornography, under 18 U.S.C. § 2252A(a)(5)(B) and (b)(2); one count of receipt of child pornography, under 18 U.S.C. § 2252A(a)(2)(A) and (b)(1); and one count of obstruction of justice, under 18 U.S.C. § 1512(c)(2). He contends that his Fourth Amendment

---

[1] Judge Norman A. Mordue ruled on Lajeunesse's motion to suppress. Judge Suddaby presided over Lajeunesse's plea proceedings and sentencing hearings.

rights were violated by a New York probation officer's search of his cell phone and a further search by New York State Police, and that the trial court erred in failing to allow him allocution at sentencing. He was sentenced primarily to 198 months of imprisonment.

As part of his plea agreement, Lajeunesse retained the right to appeal the district court's denial of his motion to suppress the evidence seized in two searches of his cell phone—one by probation officers, and a second search by the police—but otherwise waived his rights to appeal any sentence "to a term of imprisonment of 210 months or less." App'x at 193–94. In response to Lajeunesse's sentencing appeal, the government contends that, as his sentence was less than 210 months, this claim is barred by his appeal waiver. We reject the government's argument and therefore remand for resentencing, at which Lajeunesse will be afforded the opportunity to address the court. With respect to the defendant's Fourth Amendment claims, we reject them and, in that regard, affirm his convictions.

## BACKGROUND

On June 6, 2018, in another case, Lajeunesse was convicted in the courts of the State of New York on one count of possessing a "sexual performance"

3

by a child—that is, a visual representation of sexual conduct involving a child—in violation of N.Y. Penal Law § 263.16. Lajeunesse was placed on interim probation for one year. Among the terms of his probation, Lajeunesse was required to comply with over forty general and special conditions. These conditions included his consent to home visits by his probation officer and to unannounced examinations of all of his electronics "by the supervising Probation Officer or designees" including any cell phones to which he had access. App'x at 155 ¶ 3, 157 ¶ 24. For electronic devices and applications that were password protected, he was required to provide the passwords to his probation officer. He was also prohibited from using social media without permission and from interacting with anybody under the age of 18, whether in person or online, without supervision. The probation conditions most relevant to this case are set forth below:

1. Have no deliberate contact with persons under the age of 18 unless supervised by a person approved by your probation officer or the Court and only under circumstances approved by your probation officer or the Court. . . .

9. *Permit search of your person*, vehicle and place of abode, *including any computers or other electronic devices, . . .* such search to be conducted by a Probation Officer or a Probation Officer and his agent. . . .

4

12. Shall abide by such curfew as directed by your Probation Officer and shall be at your residence at the hours established in your curfew. (10pm–6am) . . .

14. Not to use/possess/view pornography, erotica, or any other sexually stimulating material/media or items. . . .

19. Not purchase, possess, or indulge in the use of alcohol or products that contain alcohol. . . .

24. *You will agree to unannounced examination by the supervising Probation Officer* or designees *of any and all computer(s) and/or other electronic device(s)* to which you have access. This includes access to . . . *cell phones*, . . . This examination may be conducted where the equipment is located or may be removed and examined in a controlled or laboratory facility. If a device/program is password protected, probationer shall disclose said password to his/her Probation Officer. . . .

36. The Probation Officer shall have the ability to search social networking internet sites and/or programs for probationer information. If the internet site/program is password protected, the probationer shall disclose said password to his/her probation officer.

37. You are prohibited from using the internet to: access pornographic material and/or *any commercial social networking website*; communicate with other individuals or groups for the purpose of promoting sexual relations with any person(s) under the age of 18; *communicate with a person under the age of 18* when you are over the age of 18.

*Id.* at 123–26 (emphases added). In the New York State proceeding,

Lajeunesse was read these terms, signed his acknowledgment that he had

read and understood the conditions of his probation, and affirmed his

understanding that, should he violate the terms, his interim probation could

be revoked. Warren County Probation Officer Murray was assigned to supervise Lajeunesse's probation.

On February 23, 2019, Officer Murray received a tip from Lajeunesse's ex-wife, who had known Lajeunesse "for many years." *Id.* at 43. She informed Officer Murray that Lajeunesse has been: "dating a teenage girl" who is "so young and vulnerable," and "staying over at her house frequently overnight and drinking," conducting "alarming" activity on Facebook, and "pray[ing] on [sic]" other teenage girls overseas. *Id.* at 43, 169. The informant also referred Officer Murray to the Facebook page of the supposedly teenage girl whom Lajeunesse was allegedly dating.

Upon examining the Facebook page, Officer Murray concluded that the girl appeared to be under the age of 18, but he was unable to determine her age from that source. He found evidence that Lajeunesse had been communicating with the girl through a Facebook account that he had not registered with Officer Murray, as required by the terms of Lajeunesse's probation. Officer Murray contacted a Task Force Officer of the Federal Bureau of Investigation (FBI), asking for assistance to search Lajeunesse's

6

phone, but was told that the FBI would not review the phone without a search warrant.

On March 11, 2019, about two weeks after receiving the tip, Officer Murray conducted a scheduled visit at Lajeunesse's home to determine whether he was complying with his probation conditions. He asked to see Lajeunesse's cell phone and Lajeunesse handed it to him. When Officer Murray opened the phone, he saw a picture of the girl from the Facebook page. Lajeunesse said that he had been in a sexual relationship with her since November 2018 and that she was 19 years old, nearly 20. Murray later confirmed that what Lajeunesse said about the young woman's age was accurate.

After seeing the photo and hearing about Lajeunesse's sexual relationship with the girl who appeared to be underage, Officer Murray requested assistance from two other probation officers who had more familiarity with cell phones. One of these probation officers, while conducting a "cursory search" of the phone, found a file showing what appeared to be two teenage girls, one of whom was naked and seemed to be about 13 or 14 years old. App'x at 170. The officers also found what they believed to be a

7

media storage application, which they could not open because Lajeunesse claimed not to know the pin number needed to unlock the application. At this point, Officer Murray seized the phone in order to conduct "a full forensic search based on the presence of child pornography, and subject to the conditions of [d]efendant's probation." *Id.*

Officer Murray again reached out to the FBI Task Force Officer for assistance with the phone, but she again declined to search the phone without a warrant. Murray then asked New York State Police Investigator John Deyette to assist "as an agent of probation." *Id.* at 171. Deyette made a forensic examination of the phone, which uncovered several images and videos of sexually explicit conduct involving minors. Lajeunesse was arrested by New York State authorities on April 2, 2019, at which time the State Police seized a second phone belonging to Lajeunesse. In June 2019, the FBI began investigating Lajeunesse's use of the two cell phones and obtained a warrant to search the second cell phone. The FBI's investigation resulted in a federal indictment on October 16, 2019, for the child pornography offenses. In 2020, Lajeunesse moved to suppress the material obtained through the searches of his cell phones. Judge Mordue denied the motion on November 24, 2020.

8

In September 2019, while Lajeunesse was being held on these charges, he sent two letters to his then 16-year-old son, asking him to claim responsibility for the pornography so as to "create a little reasonable doubt" by saying that "you used my phone because yours was broken and you went on a file sharing site and downloaded some files on accident key word 'accident' . . ." and adding that "[y]ou were 14 at the time so they wouldn't be able to do Jack Shit to you anyway." *Id.* at 268; 278–79. On the basis of these letters, on August 12, 2021, Lajeunesse was charged by superseding information with one count of obstruction of justice, pursuant to 18 U.S.C. § 1512(c)(2), in addition to the child pornography charges.

On the same day, Lajeunesse entered into an agreement to plead guilty, conditional on preserving his right to appeal the denial of his motion to suppress. As part of the plea agreement, Lajeunesse waived his right to "appeal and/or to collaterally attack . . . [a]ny sentence to a term of imprisonment of 210 months or less; . . . ." *Id.* at 193 ¶ 7(d). At Lajeunesse's plea hearing, the district court confirmed that Lajeunesse had waived his right to indictment by a grand jury and understood the consequences of pleading guilty. The court explicitly asked Lajeunesse if he understood that

9

he would be unable to appeal his sentence, per the plea agreement, if the court sentenced him to fewer than 210 months of imprisonment and Lajeunesse responded that he understood. *Id.* at 243.

Lajeunesse's sentencing proceedings were held on January 26, 2022. Prior to the proceedings, Lajeunesse had written a letter to the court, which his attorney referenced in his filings. After verifying that Lajeunesse was present and that there were no remaining objections, the court gave the government an opportunity to speak. The government rested on its papers. The court then addressed Lajeunesse's lawyer, directly. *Id.* at 273 ("Mr. Primomo, when you're ready, sir, you can go ahead."). Referring to Lajeunesse's letter in his statement, Lajeunesse's lawyer urged the court to sentence Lajeunesse to no more than the mandatory minimum term of 180 months, emphasizing that Lajeunesse had been in a vulnerable place when he asked his son to take the blame for the child pornography found on his phone, that he had had a dysfunctional youth, and that he had accepted the consequences of his actions. *Id.* at 274–76. Defense counsel also asked the court not to allow the conditional nature of the guilty plea—retaining Lajeunesse's right to appeal the motion to suppress—to affect his sentence.

After defense counsel's statement, the court gave assurance that it would not consider the motion to suppress in sentencing and then, without having asked whether Lajeunesse would like to address the court, declared itself ready to impose sentence. *Id.* at 277. Without specifically mentioning Lajeunesse's personal letter to the court, the court stated that it had reviewed "all pertinent information . . . ." *Id.* Having found the guideline sentencing range to be 180 to 210 months, the court sentenced Lajeunesse to 198 months in prison followed by 20 years of supervised release. *Id.* at 281–82.

The court did not address Lajeunesse directly at any time during the sentencing hearing, except to ask if he waived a reading of special conditions that would be applicable during his supervised release. At no time during the proceeding was Lajeunesse asked whether there was anything he wanted to say to the court or otherwise given an opportunity for allocution. Neither Lajeunesse nor his attorney raised any objection to the lack of offer to allocute during the sentencing hearing.

## DISCUSSION

### I. Motion to Suppress

Lajeunesse argues that the evidence obtained from his cell phone should be suppressed because the searches were unconstitutional under the Fourth Amendment. He argues that the evidence from the first search should be suppressed because: (1) even with Lajeunesse's diminished privacy interests as a probationer, the probation officers were required to have reasonable suspicion for the search of his cell phone; (2) the probation officers did not have reasonable suspicion that Lajeunesse was in a relationship with an underage girl or that he possessed illicit images; and (3) therefore, because Officer Murray had reasonable suspicion only that Lajeunesse was using Facebook, the probation officers were at most entitled to search his phone for evidence that he was violating the social media condition of his probation. Appellant's Br. at 17 (citing *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007)); *id.* at 18–20. He contends that the evidence from the later search by the New York State Police should be suppressed as fruit of the poisoned tree. *Id.* at 23 (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1962)).

The government contends that the probation officers' search of the cell phone was "rationally and reasonably related to the performance of Probation Officer Murray's duties" such that it was a constitutional search under the special-needs exception to the Fourth Amendment. In addition, the government argues that because the search was supported by reasonable suspicion that the phone contained child pornography and probable cause that Lajeunesse was violating the social media terms of his probation, it was reasonable under the totality of the circumstances because of Lajeunesse's diminished expectation of privacy as a probationer who had agreed to a search condition. Appellee's Br. at 31–33. Even if the search is found to be unreasonable, the government argues that the exclusionary rule should not apply.

Judge Mordue denied Lajeunesse's motion to suppress because Officer Murray "had reasonable suspicion to believe that [Lajeunesse] was violating the terms of his probation and/or committing new crimes based on the tip from Defendant's ex-wife, [Lajeunesse's] criminal history, the girl's Facebook profile, and [Lajeunesse's] apparent communications with her via Facebook" meaning the search was "within the scope of the terms of [his] probation,

13

rationally related to the duties of Officer Murray, and reasonable under the circumstances." App'x at 176. The district court also found that "[Lajeunesse] consented to the initial search of his cell phone, which arguably provided an independent basis to proceed." *Id.*

When reviewing a district court's denial of a motion to suppress, we review findings of fact for clear error and legal findings *de novo. United States v. Chandler*, 56 F.4th 27, 40 (2d Cir. 2022); *see also Chirino*, 483 F.3d at 148; *United States v. Bershchansky*, 788 F.3d 102, 108–09 (2d Cir. 2015). We agree with the district court and affirm the denial of Lajeunesse's motion to suppress.

The parties' briefs focus on the metes and bounds of the special-needs exception to the Fourth Amendment and whether or not there was reasonable suspicion to search Lajeunesse's phone. We find this perplexing because Judge Mordue noted that Lajeunesse had consented to the initial search of his cell phone by giving Officer Murray his phone upon the officer's request. In addition, Lajeunesse had given his signed agreement to a condition of probation that he would agree to unannounced searches of his cell phone by his probation officer and the officer's designees. It seems likely—although we

14

do not reach a conclusion on the question—that Lajeunesse had thus

consented to the search to which he now objects.[2] Consent is a long-

recognized, well-settled exception to the warrant and probable cause

requirement. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973);

*United States v. Bracer*, 342 F.2d 522, 524–25 (2d Cir. 1965).

Because the government has not argued that Lajeunesse's consent alone

was sufficient to legitimate the probation officer's search, we will examine

also whether the searches were valid in considering the totality of the

circumstances under two standards discussed in Supreme Court opinions.

1. <u>The search was constitutional under the standard articulated by *United States v. Knights*</u>

The Fourth Amendment protects "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches

---

[2] Lajeunesse possibly consented to a search by handing his cell phone to Officer Murray, at the officer's request, with the knowledge that he had, as a term of his probation, agreed to searches of all applications on his phone. A typical reasonable person, knowledgeable of this agreement, might infer that Lajeunesse, by handing over his phone to Officer Murray, had agreed to a general search of his phone—as outlined in the terms of his probation—to ensure he was complying with the terms of his probation. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (explaining that the scope of consent is limited by objective reasonableness).

and seizures . . . ." U.S. Const. amend. IV. Typically, for a search to be reasonable, a warrant must be issued, supported by probable cause. *See, e.g.*, *Schneckloth*, 412 U.S. at 219.

In *United States v. Knights*, however, the Supreme Court held that, when viewing "the totality of the circumstances," the legitimate expectation of privacy of a probationer subject to a search condition was so diminished that a police officer could constitutionally search the probationer's apartment based on only reasonable suspicion. 534 U.S. 112, 118–21 (2001). Because reasonable suspicion existed in that case, the Court did not clarify whether reasonable suspicion was necessary or merely sufficient to justify a search notwithstanding a probationer's diminished expectation of privacy, *id.* at 120 n.6, and declined to address whether the defendant's signed agreement to the probation conditions requiring unannounced searches constituted consent, thus rendering reasonable suspicion unnecessary. *Id.* at 114, 118, 120 n.6; *see also Schneckloth*, 412 U.S. at 219 (explaining that consent is an exception to the warrant and probable cause requirement of the Fourth Amendment). The Court later held in *Samson v. California* that a search condition can so diminish a *parolee's* expectation of privacy that the Fourth Amendment permits even a

16

suspicionless search by a law enforcement officer, provided the search is not arbitrary or harassing. 547 U.S. 843, 847, 850, 856 (2006). This question has not been squarely addressed in the probationer context, and probationers are entitled to a greater degree of privacy than are parolees. *Id.* at 850; *see also United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004). We need not address the question of whether a search condition requiring submission to searches can so diminish the expectation of privacy of a probationer that a suspicionless search would be constitutional under *Knights*, because Officer Murray clearly had reasonable suspicion that contraband or evidence of illicit activity could be found on Lajeunesse's phone.

Lajeunesse's expectation of privacy in his phone was "severely diminished" due to the fact that he had agreed to unannounced searches of all his electronics, including his cell phones, as a term of his probation, and signed a document outlining those terms. *See United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002). This search condition included a warning that such searches may take place offsite, indicating that even forensic searches were within the scope of the provision, and required Lajeunesse to agree to provide passcodes to his devices and their internal applications. As in *Knights*, "the

probation order clearly expressed the search condition and [Lajeunesse] was unambiguously informed of it." *Knights*, 534 U.S. at 119. Accordingly, as in *Knights*, reasonable suspicion is sufficient for a search of Lajeunesse's phone to satisfy the Fourth Amendment. *See United States v. Lifshitz*, 369 F.3d 173, 181 (2d Cir. 2004) ("Probationary searches—whether for law enforcement or probationary purposes—are acceptable under *Knights* if based upon reasonable suspicion (or potentially a lesser standard).").

Reasonable suspicion exists when there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest." *United States v. Elmore*, 482 F.3d 172, 178–79 (2d Cir. 2007) (alterations adopted) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Reasonable suspicion "need not rise to the level required for probable cause, and . . . falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).

Officer Murray reasonably suspected that Lajeunesse was violating the terms of his probation and engaging in illegal activity. He had received a tip that Lajeunesse was breaking multiple terms of his probation, including by

18

drinking, using social media, and breaking curfew, and that, most importantly, he was in a romantic relationship with a teenager described as "so young and vulnerable." App'x at 43. The tip further alleged that Lajeunesse was interacting with other teenage girls on Facebook. *Id.* Officer Murray had corroborated elements of this tip by investigating the Facebook page of the teenager with whom Lajeunesse was allegedly in a relationship. He saw evidence that Lajeunesse had interacted with her Facebook page, and her page contained pictures of a girl who appeared to be under 18. In addition, Officer Murray also knew that Lajeunesse was on probation because he had possessed child pornography. On our review, it appears that the probation conditions were designed as safeguards to prevent Lajeunesse from accessing child pornography or having inappropriate interactions with children. In fact, the same probation condition that forbade Lajeunesse from using social media also forbade him from accessing pornography websites and using the internet to contact underage people. *Id.* at 40 ¶ 37. Once Officer Murray had received the tip and confirmed that Lajeunesse was using an unregistered social media account to interact with at least one girl who appeared to be underage—and, on the basis of the tip, had reason to believe

that he was dating that girl and spending the night at her house—he could reasonably suspect not only that Lajeunesse was violating terms of his probation (terms that appeared to be calculated to prevent him from acquiring child pornography), but also that he was breaking the law by having a sexual relationship with an underage girl.

Lajeunesse argues that, although Officer Murray had reasonable suspicion that Lajeunesse was violating the social media term of his probation, this did not entitle him to a general search of Lajeunesse's phone, but only to a search for evidence regarding the social media condition. Lajeunesse also contends that before searching his phone, Officer Murray should have conducted an investigation to determine whether or not the teenager was, in fact, underage. Lajeunesse points to indicia on the Facebook page that the girl was not underage, such as that the tip had said Lajeunesse was staying at "her" house (as opposed to her parents' house), that she was listed as being from one town but living in another, and that her profile suggested she was no longer attending high school. Appellant's Br. at 20. In Lajeunesse's view, Officer Murray's failure to investigate further, combined

20

with the fact that Lajeunesse told Murray that the girl was 19 years old, shows that the search was harassing or arbitrary.

We do not find these arguments convincing. The violation of the social media term did not happen in isolation and must be considered in context, including, most importantly, that it supported Officer Murray's reasonable suspicion that Lajeunesse was dating an underage girl, and that Officer Murray knew about Lajeunesse's past child pornography possession conviction. It was proper in these circumstances for Officer Murray to search the phone, after he had confirmed the violation of the social media term and that Lajeunesse was interacting with the girl. *Cf. United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) (explaining that once a parole officer found a machete, she had reasonable suspicion to search for additional contraband). Nor does the fact that Lajeunesse told Officer Murray that his girlfriend was 19 years old or the fact that her Facebook page contained details that could be read to suggest she was of age mean that Murray was bound to take Lajeunesse at his word, particularly when Murray had seen evidence to the contrary—the photos on the Facebook page—suggesting she was underage. Just as an officer conducting an arrest is not required to consider every

21

alternative explanation of innocence, Murray was not obligated to accept

Lajeunesse's self-serving contention that she was of age. *See, e.g., Ricciuti v.*

*N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *see also Martinsky v. City*

*of Bridgeport*, 504 F. App'x 43, 46 (2d Cir. 2012) (summary order). To conclude

otherwise would allow any probationer to evade detection by lying.

Finally, Lajeunesse argues that this search is "particularly troubling"

because it was a search of a cell phone, Appellant's Br. at 22, noting that the

Supreme Court ruled in *Riley v. California* that the search of a cell phone

incident to arrest was not permissible under the Fourth Amendment. 573 U.S.

373, 401–02 (2014).[3] Notwithstanding that *Riley* gave cell phones a broader

scope of protection under the Fourth Amendment than physical space, *id.* at

---

[3] Lajeunesse also cites to *United States v. Fletcher* as additional support that
phones should be treated differently in these circumstances. In that case,
however, the search at issue was unreasonable because the probationer's cell
phone was not subject to a search condition and, therefore, the search of his
phone fell outside of the regulation authorizing probation searches and was
not a special-needs search. 978 F.3d 1009, 1018 (6th Cir. 2020). The search in
that case was also found to be unreasonable under the totality of the
circumstances, applying the *United States v. Knights* framework, because "[the
defendant's] probation agreement could have but did not authorize the search
of his cell phones or digital devices." *Id.* at 1020. Here, Lajeunesse's probation
conditions explicitly include a search condition for all electronics, including
his cell phone, and any storage application on those electronics.

386, we do not construe that ruling as implying that these circumstances would not justify Murray's search of Lajeunesse's cell phone.

Because Officer Murray reasonably suspected that Lajeunesse's phone would show violations of the terms of his probation and/or illegal activity, and because Lajeunesse's expectation of privacy was further steeply diminished on account of the terms of his probation, we conclude that the search of his phone was reasonable under the Fourth Amendment.

2. The search was also constitutional under the "special-needs" exception of *Griffin v. Wisconsin*

We also examine the search under the special-needs analysis of *Griffin v. Wisconsin*.

In *Griffin*, the Supreme Court identified an exception to the warrant and probable cause requirement of the Fourth Amendment, ruling that the "special need" of a state operating a probation system "permit[s] a degree of impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. 868, 875 (1987). In *Griffin*, the warrantless search of a probationer's home by a probation officer was held reasonable because "it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880. As we have previously explained, the "special-needs" framework

23

espoused in *Griffin* rests on the "rehabilitative relationship between the [probationer] and the [probation] officer, and thus [does] not extend[] to other law enforcement officers unless they are acting under the direction of the [probation] officer." *United States v. Braggs*, 5 F.4th 183, 188 (2d Cir. 2021) (quoting *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007)). Otherwise, the special-needs framework is more deferential to the needs of the probation system than the *Knights* framework and requires only that the search be "conducted pursuant to a valid regulation governing probationers." *Griffin*, 483 U.S. at 880; *id.* at 873 ("The search of Griffin's home satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles."); *Braggs*, 5 F.4th at 187 n.4 (citing *United States v. Quinones*, 457 F. App'x 68, 69 n.1 (2d Cir. 2012) (summary order)). We find that this requirement was met.

The search of Lajeunesse's phone was pursuant to a court-ordered probationary condition, which "carries as much if not more constitutional weight" as a regulation applicable to all probationers. *People v. Hale*, 93 N.Y.2d 454, 460 (N.Y. 1999); *see also United States v. Grimes*, 225 F.3d 254, 258

24

n.3 (2d Cir. 2000) (per curiam) ("The critical question, for Fourth Amendment purposes, is whether the regulation contains a reasonableness requirement (or some more stringent standard); it is not which branch of Government generated the rule."); *United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir. 1990). Under New York law, a probation officer may search a probationer pursuant to a search condition, if the scope of the search condition is "circumscribed to specified types of searches by probation officers acting within the scope of their supervisory duty and in the context of the probationary goal of rehabilitation." *Hale*, 93 N.Y.2d at 460, 462.[4] The New York Court of Appeals has explained that this standard is "essentially" the same as the limitation on searches by parole officers, which is that a search must be rationally and reasonably related to the parole officer's duties. *People v. Jackson*, 46 N.Y.2d 171, 175 (N.Y. 1978); *People v. Huntley*, 43 N.Y.2d 175, 181 (N.Y. 1977).[5] With respect to parolees, we have long held that a requirement

_____

[4] Absent a search condition, the state imposes further limitations on the search of a probationer. N.Y. Crim. Proc. L. § 410.50; *Hale*, 93 N.Y.2d at 460, 462.
[5] In *People v. Jackson*, the New York Court of Appeals explained that a requirement that a search be "consistent with the duty to supervise adherence to the conditions of probation or parole and the duty to influence the offender

25

that a search be "rationally and reasonably related to the performance of [a]

parole officer's duty" is a valid rule governing special-needs searches. *United

States v. Grimes*, 225 F.3d 254, 258–59, 259 n.4 (2d Cir. 2000) (quoting *Huntley*,

43 N.Y.2d at 181). By the same logic, a state law requirement that a search

must be rationally and reasonably related to a probation officer's duties is

also consistent with the requirements of the Fourth Amendment.

As in *Griffin*, therefore, the search of Lajeunesse's phone was pursuant

to a valid rule, because it was authorized by a search condition that contained

an acceptable court-made reasonableness limitation comporting with the

Fourth Amendment. *See Grimes*, 225 F.3d at 258 n.3.[6] We next assess whether

---

to refrain from unlawful conduct" is "essentially" the same as the limitations
on parole officers, 46 N.Y.2d at 175, which is that a search must be "rationally
and reasonably related to the performance of the parole officer's duty,"
*Huntley*, 43 N.Y.2d at 181.

[6] Certain search conditions may be too restrictive, too burdensome, or too
intrusive to pass muster under the Fourth Amendment. *See Lifshitz*, 369 F.3d
at 193 (finding that a probation requirement that the defendant install
software that continuously monitored his computer usage may be an
unconstitutional intrusion); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d
Cir. 2002) (finding unconstitutional a probation condition that banned a
defendant from using any computers and noting that a better approach
would be unannounced inspections of the defendant's computer). However,
Lajeunesse has not challenged the conditions of his probation.

the search was permissible under that rule: was the probation officers' search of Lajeunesse's phone rationally and reasonably related to their roles as probation officers? It is clear that it was.

There can be no question that a search is rationally and reasonably related to a probation officer's duties if the probation officer reasonably suspects that the probationer is violating a term of probation or is otherwise engaged in criminal behavior. *See Griffin*, 483 U.S. at 875 (explaining that restrictions placed on probationers "are meant to assure that probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."); *Newton*, 369 F.3d at 666 (explaining that "the obligation to detect and prevent parole violations . . . is part of a parole officer's duty" (citation and quotation marks omitted)). Because we have already concluded that Officer Murray had reasonable suspicion to conduct this search, the search of Lajeunesse's phone by Officer Murray (and the other probation officers acting under his direction) was rationally and reasonably related to Officer Murray's duties as a probation officer. As such, it was

pursuant to a valid rule governing probationers and constitutional under the special-needs exception to the Fourth Amendment.[7]

3. <u>The second search of Lajeunesse's phone was not fruit of the poisoned tree</u>

Lajeunesse's sole argument regarding a later search of his phone by the New York State Police is that it is the fruit of a poisoned tree because it was justified by the findings on the earlier cell phone search, which violated the Fourth Amendment. The argument has no validity because we have concluded that the initial search of Lajeunesse's phone was reasonable under the Fourth Amendment. Because the initial search was constitutional, the subsequent search by the New York State Police, based in part on the earlier findings, was not the fruit of a poisoned tree. *See Wong Sun v. United States*, 371 U.S. 471 (1962). The district court properly denied Lajeunesse's motion to suppress.

_____

[7] Needless to say, if Lajeunesse's agreement to the conditions of probation requiring his assent to searches of his phone, coupled with his turning over his phone to Officer Murray upon his request, constituted consent to the search (a question on which we express no opinion), the Fourth Amendment would not require reasonable suspicion to justify the search. *See, e.g., Knights*, 534 U.S. at 118, 120 n.6; *Schneckloth*, 412 U.S. at 219; *Florida v. Jimeno*, 500 U.S. at 249.

## II.    Failure to Allow Allocution at Sentencing

Lajeunesse argues that the district court's failure to provide him an opportunity for allocution at his sentencing requires that we vacate his sentence and remand for resentencing, notwithstanding his waiver of his rights to appeal a sentence to a term of imprisonment of less than 210 months or his failure to object at sentencing. The government argues principally that Lajeunesse's appeal waiver is broad and bars him from appealing his sentence, especially given this court's presumption of enforceability of appellate waivers. Lajeunesse argues that the language in his waiver was narrower than the type of language we have previously upheld and that it should not be enforced in this instance.

We first assess whether Lajeunesse's waiver bars him from appealing this alleged error, and second, whether this allocution error, to which no objection was made during the sentencing proceeding, requires that the sentence be vacated. We hold that the appeal waiver does not bar this appeal and that resentencing is required.

1. The appeal waiver does not bar this appeal

Lajeunesse's plea agreement waived his right to appeal "any sentence to a term of imprisonment of 210 months or less." App'x at 193. Because Lajeunesse was sentenced to a prison term of 198 months, the government asserts that he waived the right to appeal. Lajeunesse argues that his appeal waiver does not cover a procedural error such as allocution. Considering the appellate waiver in the context of the full plea agreement and in light of the importance of the right to allocution, we conclude that his broad general waiver should be construed as not contemplating a scenario in which the district court failed to invite allocution and therefore does not cover it.

"We review plea agreements, including waivers of the right to appeal, *de novo* and in accordance with general principles of the law of contract." *United States v. Green*, 897 F.3d 443, 447 (2d Cir. 2018); *see also United States v. Yemitan*, 70 F.3d 746, 747 (2d Cir. 1995). But plea agreements are not ordinary contracts. Rather, we "temper the application of ordinary contract principles with 'special due process concerns for fairness and the adequacy of procedural safeguards.'" *United States v. Granik*, 386 F.3d 404, 413 (2d Cir. 2004) (quoting *United States v. Altro*, 180 F.3d 372, 375 (2d Cir. 1999)). Further,

30

recognizing the government's "awesome advantages in bargaining power" in construing such agreements, we tend to favor the defendants in cases of doubt. *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996), *superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013); *see also United States v. Woltmann*, 610 F.3d 37, 40 (2d Cir. 2010) ("Such contracts are narrowly construed.").

A plea agreement that waives the right to appeal a sentence is "presumptively enforceable" if it has been entered into "knowingly, voluntarily, and competently." *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011) (first quoting *United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010); and then quoting *United States v. Gomez–Perez*, 215 F.3d 315, 318 (2d Cir. 2000)). Exceptions to this presumption "occupy a very circumscribed area of our jurisprudence." *Riggi*, 649 F.3d at 147 (quoting *Gomez-Perez*, 215 F.3d at 319). In part, this has been to preserve the value of an appellate waiver as a "bargaining chip" for the defendant. *Yemitan*, 70 F.3d at 748.

Nonetheless, not all appellate waivers are enforceable. Prior rulings have shed some light on what sorts of errors may be found to fall outside the scope of a general appeal waiver. We have explained that "'a defendant may

be deemed incapable of waiving a right that has an overriding impact on public interests,' . . . as such a waiver may 'irreparably discredit[] the federal courts.'" *Riggi*, 649 F.3d at 148 (alteration in original) (quoting *Ready*, 82 F.3d at 555–56). For example, we have suggested that "a sentence tainted by racial bias could not be supported on contract principles, since neither party can be deemed to have accepted such a risk or be entitled to such a result as a benefit of the bargain." *Yemitan*, 70 F.3d at 748; *see also United States v. Jacobson*, 15 F.3d 19, 22–23 (2d Cir. 1994) (holding that an appellate waiver did not extend to "an arguably unconstitutional use of naturalized status as the basis for a sentence."). We have also found that an appellate waiver did not extend to cover scenarios in which the district court rooted its decision in mistakes of fact. *United States v. Liriano-Blanco*, 510 F.3d 168, 174–75 (2d Cir. 2007) (finding that the appellate waiver did not cover court's sentence when based on the mistaken belief that the defendant had retained the right to appeal a relevant legal question).

We have enforced general appellate waivers as to claims of more clerical procedural errors. For example, we have construed general appellate waivers to cover instances in which a judge failed to provide a rationale for

the particular sentence, in contravention to 18 U.S.C. § 3553(c)(1), although noting that, "[a]t some point, . . . an arbitrary practice of sentencing without proffered reasons would amount to an abdication of judicial responsibility subject to mandamus . . . ." *Yemitan*, 70 F.3d at 748. Similarly, we have upheld general appellate waivers in cases where the district court failed to rule on objections to the Presentencing Report (PSR) and on requests for a downward departure, did not adopt the findings of the PSR, did not explain its analysis of the sentencing factors, and did not calculate a sentencing range. *United States v. Buissereth*, 638 F.3d 114, 117–18 (2d Cir. 2011). In so doing, however, we recognized that "it is apparent from the transcript . . . that the District Court gave due consideration to [the defendant's] sentencing arguments." *Id.* at 118; *see also Arevalo*, 628 F.3d at 99 (upholding an appellate waiver when the district court failed to make an explicit determination on facts in the PSR, but recognizing that the district court had "heard the parties' objection" and "ultimately agreed . . . that the lower Guidelines range should apply").

The nub of the appeal waiver analysis is "the nature of the right at issue and whether the sentence 'was reached in a manner that the plea agreement did not anticipate.'" *Riggi*, 649 F.3d at 148 (quoting *Liriano-Blanco*, 510 F.3d at

174). Applying this framework, we now assess the nature of the right to allocution at sentencing and whether Lajeunesse's plea agreement could have anticipated that his sentence would be reached without him having had an opportunity to address the court.

Although the right to allocution is not a constitutional right, this court has described it as an "absolute right." *United States v. Li*, 115 F.3d 125, 132–33 (2d Cir. 1997) (quoting *United States v. Sparrow*, 673 F.2d 862, 865 (5th Cir. 1982)). The right has been codified in the Federal Rules of Criminal Procedure for over 80 years, and its history extends back much further. *See* Fed. R. Crim. P. 32(i)(4)(A)(ii) ("Before imposing sentence, the court must: . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence."). The leading resource on the history of allocution describes the practice as "of such ancientness that it is difficult, if not impossible, to discover its historical origin." *See* Paul W. Barrett, *Allocution*, 9 Mo. L. R. 115, 115 (1944). Allocution has its roots in common law, dating back to at least 1689. *Id.* at 121; *see also Schwab v. Berggren*, 143 U.S. 442, 446 (1892) (tracing allocution to common law); *Green v. United States*, 365 U.S. 301, 304 (1961) (same); *see also Rex v. Royce*, 4 Burr. 2073, 2086, 98 Eng. Rep. 81

34

(K.B. 1767) (summarizing an allocution that occurred at sentencing). At common law, a bill of attainder—which prevented the family of the defendant from inheriting property or titles—could be reversed if allocution had not been offered. Barrett, *Allocution* at 129–30; *see Anonymous*, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B. 1689) (reversing a bill of attainder because the defendant was not given an opportunity to say "why sentence of death shall not pass upon him"); *The King v. Speke*, 90 Eng. Rep. 1047 (K.B. 1689–1712) (same); *Rex & Regina v. Geary*, 2 Salk. 630, 91 Eng. Rep. 532 (K.B. 1689–1712) (same).

Allocution is "designed to enable our system of justice to mete out punishment in the most equitable fashion possible, [and] to help ensure that sentencing is particularized and reflects individual circumstances." *Li*, 115 F.3d at 133 (quoting *United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991)). Given that about 98% of criminal convictions adjudicated in a U.S. district court are the result of a plea agreement, for nearly all convicted defendants, a defendant's *sole* opportunity to address the court and share his or her story is during allocution at sentencing. *See* Mark Motivans, Bureau of Justice

35

Statistics, Federal Justice Statistics, 2020 at 10 (May 2022).[8] We have observed

that allocution humanizes the sentencing process, providing a defendant with

an opportunity to be heard and reducing the appearance of "assembly-line

justice." *Li*, 115 F.3d at 133 (quoting *Barnes*, 948 F.2d at 331).

In sum, while allocution is not a constitutional right, the right is a

weighty one that is essential to the sentencing process and that carries

important public policy implications. Furthermore, deprivation of allocution

is a far more substantial error than the clerical, non-prejudicial procedural

errors for which we have enforced appellate waivers. *See, e.g.*, *Buissereth*, 638

F.3d 114; *Arevalo*, 628 F.3d at 99. Here, the nature of the error meant that the

district court lacked access to important information—the defendant's

attitude towards his commission of the crime[9]—and is therefore more akin to

---

[8] Table 6 of this report shows that, in FY 2020, 90.9% of criminal cases in a U.S. district court resulted in convictions following a guilty plea. In comparison, 1.7% of criminal cases resulted in convictions following a trial. This means that of the 92.6% of federal criminal cases that resulted in a conviction, 98.1% of those convictions were the result of a guilty plea. *See also* Mark Motivans, Bureau of Justice Statistics, Federal Justice Statistics, 2019 at 10 (Oct. 2021).
[9] Lajeunesse's letter to the court cannot, alone, provide this information. A face-to-face communication gives the court an infinitely better opportunity to evaluate the sincerity of claims of contrition and remorse than a letter.

a case where the district court rooted its decision in mistaken fact. *Liriano-Blanco*, 510 F.3d at 174. The guideline sentencing range was 180 to 210 months imprisonment and surely, the defendant's remorsefulness—or lack thereof—could have impacted the district court's sentencing decision.

We next consider whether Lajeunesse's plea agreement should be construed as including an agreement on Lajeunesse's part to give up his right to this statutorily-guaranteed opportunity to address the court as to his sentence, in the event the court erroneously failed to accord him the right. Lajeunesse's plea agreement waived his right to appeal "[a]ny sentence to a term of imprisonment of 210 months or less." App'x at 193. This waiver is broad on its face, but when viewed in the context of the entire contract and against the backdrop of the magnitude of the right to allocution, we find it cannot be reasonably read to have contemplated this scenario, in which Lajeunesse would be deprived of his right to allocution. The agreement seems to take Lajeunesse's allocution as a given. For example, the agreement explains, "The defendant understands that the sentencing court may consider

---

Furthermore, some people, perhaps including Lajeunesse, may lack resources to communicate such sentiments in writing.

any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, *and at sentencing when imposing sentence.*" *Id.* at 197–98 (emphasis added). Similarly, should Lajeunesse breach the agreement, in future proceedings against him, the government may "utilize any information, statement, or testimony provided by the defendant in any proceeding, *including at sentencing . . . .*" *Id.* at 205 (emphasis added).

It also seems to us that a circumstance, such as this one, where the district court fails to invite the defendant to speak at sentencing and no objection is made, such that the district court's error is not called to its attention prior to pronouncing a sentence, is likely a rarity. It therefore seems unlikely to be the type of error that one would anticipate in drafting an appellate waiver.

Given the magnitude and character of the right to allocution, its longstanding history, and our perception that this type of error is uncommon, we do not think Lajeunesse's plea agreement can reasonably be construed as anticipating a sentencing proceeding that omitted allocution. We decline to enforce the appeal waiver and proceed to the merits.

2. <u>Resentencing is required because Lajeunesse was not afforded an opportunity to speak at sentencing</u>

On the merits of the question, Lajeunesse argues that resentencing is required because he was not afforded his right to allocute. He argues that the court's failure to provide allocution calls for automatic resentencing, even under plain error review, given that he made no objection during the sentencing proceeding. The government's brief focuses on enforcement of his waiver of appeal and advances no argument against ordering resentencing in the event we do not enforce the appeal waiver. We conclude that we should remand for resentencing, as the defendant has made a reasonable argument that he is entitled to resentencing and the government has made no argument to the contrary. *See, e.g.*, *United States v. Gonzalez*, 529 F.3d 94, 97 (2d Cir. 2008). Because the government makes no argument to the contrary, we do so without ruling as to the appropriate standard of review for an unpreserved claim of failure to grant allocution. Accordingly, we remand to the district court with instructions to vacate his sentence and resentence, affording him the right of allocution.

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Lajeunesse's motion to suppress, but remand the case to the district court with instructions to vacate the sentence and resentence, affording the defendant the right of allocution in conformance with Rule 32.